# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL GRAHAM; ALEXUS DIGGS; and HEATHER CONNOLLY, on behalf of themselves and all others similarly situated,** | **:** | **Case No.**   20-496 |
| | **:** | |
| **Plaintiffs-Petitioners,** | **:** | |
| | **:** | |
| **v.** | **:** | **ELECTRONICALLY FILED** |
| | **:** | |
| **ALLEGHENY COUNTY; ORLANDO HARPER, Warden of Allegheny County Jail,** | **:** | **IMMEDIATE RELIEF SOUGHT** |
| | **:** | |
| **Defendants-Respondents.** | **:** | |

## CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      Petitioner-Plaintiffs are three individuals held at Allegheny County Jail ("ACJ") who have a serious pre-existing medical condition which the United States Centers for Disease Control has determined puts them at significantly higher risk of severe disease and death if they contract COVID-19. They claim that the conditions of confinement now existing at ACJ create a heightened and unreasonable risk of contracting COVID-19 for any person confined at the jail and a substantial risk of severe illness or death for those who are elderly and/or medically vulnerable to COVID-19. They bring this class action claim seeking immediate release of all individuals 55 and older and those with medical conditions that place them at heightened risk of severe illness or death from COVID-19, which would both remove these individuals from a life threatening situation at the jail and permit social distancing measures recommended by the Centers for Disease Control (CDC) and other public health officials to be implemented for those remaining at the jail. Plaintiffs also seek injunctive relief to require Defendants to comply with recommended safety and health measures to prevent the spread of the virus for those confined at the jail, which they are unconscionably not now implementing. For example, Defendant Harper blatantly disregarded those recommendations when, after the release of 600 people from the jail, has closed an entire floor of ACJ, consolidating, rather than distancing, the remaining population at ACJ.

2.      Prisons and jails are quickly becoming the epicenter of COVID-19 in cities throughout the country, including New York, Chicago and Philadelphia. ACJ is poised to join these ignoble ranks due to the congregate nature of jails, exacerbated by ACJ's unnecessary crowding, inadequate sanitation, denial of hygiene products and non-existent quarantine procedures.  The current conditions at ACJ create an extreme risk for rapid, uncontrollable spread

of COVID-19 throughout the facility with grave outcomes for both the incarcerated population and the surrounding communities.

3.      A substantial number of people currently held at ACJ face serious risks of life-threatening injury due to their age and/or underlying medical conditions. Issuing a writ of habeas corpus, a foundational element of the constitutional order, is both a proper and essential action to prevent unnecessary loss of life.

4.      For those who remain incarcerated at ACJ, conditions must be substantially altered to accord with the Centers for Disease Control (CDC) recommendations for social distancing and enhanced sanitation and hygiene practices. Defendants must immediately be enjoined to eliminate double-celling; provide adequate hygiene supplies; ensure that increased sanitation practices conform to CDC standards; conduct recreation and meal service in a manner that allows for appropriate social distancing; and require the use of Personal Protective Equipment (PPE) for staff and all incarcerated people.

5.      Accordingly, Petitioners/Plaintiffs, on behalf of classes of persons incarcerated at the ACJ, bring this action and request immediate release of all Petitioners/Plaintiffs and medically vulnerable individuals, coupled with appropriate support and conditions upon release, as informed by public health expertise.  If this Court does not grant immediate release on the basis of this Petition-Complaint, Petitioners/Plaintiffs request a hearing as soon as possible. Given the exponential spread of COVID-19, there is no time to spare.

## I.      JURISDICTION AND VENUE

6.      Petitioners/Plaintiffs bring this putative class action pursuant to 22 U.S.C. § 2241, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202, and the Americans with Disabilities Act, 42 U.S.C.

§§ 12101 et seq. ("ADA"), for relief from both detention and conditions of confinement that violate

their Fourteenth Amendment rights under the U.S. Constitution.

7.    This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C.

§ 2241 (habeas corpus), 28 U.S.C. § 1651 (All Writs Act), Article I, § 9, cl. 2 of the U.S.

Constitution (Suspension Clause), 28 U.S.C. § 1343(a) (civil rights jurisdiction), and 28 U.S.C.

§ 1331 (federal question jurisdiction).

8.    This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the

events and omissions giving rise to the claims occurred in the Western District of Pennsylvania.

## II.    PARTIES

9.    Plaintiff Michael Graham is a 38-year-old man currently held as a pretrial detainee

at ACJ on a probation detainer and non-violent criminal charges.  Mr. Graham has been diagnosed

with asthma and hepatitis C, conditions that have substantially limited his respiratory and digestive

systems, making him a qualified individual with a disability under the ADA. His underlying health

conditions place him at high risk of severe illness or death if he contracts COVID-19.[1]

10.    Plaintiff Alexus Diggs is a 24-year-old woman currently held as a pretrial detainee

at ACJ on a probation detainer and a misdemeanor charge. Ms. Diggs has been diagnosed with

hypertension, a condition that has substantially limited her circulatory system, making her a

qualified individual with a disability under the ADA. Her underlying health conditions place her

at increased risk of severe illness or death if she contracts COVID-19.[2]

---

[1] Exhibit A, Expert Declaration of Dr. Joseph Amon, Ph.D. MSPH, ¶ 15. Dr. Amon is an infectious
disease epidemiologist, Director of Global Health and Clinical Professor in the department of
Community Health and Prevention at the Drexel Dornsife School of Public Health with past
experience as an epidemiologist in the Epidemic Intelligence Service of the U.S. Center for Disease
Control and Prevention.
[2] *Id.* at ¶ 12.

Case 2:05-mc-02025-CB   Document 500   Filed 04/08/20   Page 5 of 32

11.     Plaintiff Heather Connolly is a 49-year-old woman currently held as a pretrial detainee at ACJ on a probation detainer and additional non-violent misdemeanor and summary charges. Ms. Connolly has been diagnosed with hepatitis C, a condition that has substantially limited her digestive system, making her a qualified individual with a disability under the ADA. Her underlying health conditions place her at high risk of severe illness or death if she contracts COVID-19.[3]

12.     Defendant Allegheny County is a county government organized and existing under the laws of the Commonwealth of Pennsylvania. Allegheny County controls and operates ACJ through Defendant Warden Orlando Harper.  Allegheny County currently has immediate custody over Plaintiffs Graham, Diggs, and Connolly and all other putative class members.

13.     Defendant Orlando Harper is the Warden at ACJ. Defendant Harper currently has immediate custody over Plaintiffs Graham, Diggs, and Connolly and all other putative class members. Defendant Harper is a policymaker for Allegheny County. Defendant Harper is sued in his official capacity.

## III.     FACTUAL ALLEGATIONS

### A.  COVID-19 Poses a Significant Risk of Illness, Injury, and Death

14.     We are in the midst of the most significant pandemic in generations.[4] The lethality rate of Coronavirus Disease 19 ("COVID-19"), the serious respiratory disease caused by this

---

[3] *Id.* at ¶ 11.
[4] John M. Barry, *The Single Most Important Lesson from the 1918 Influenza*, New York Times (March 17, 2020), https://cutt.ly/PtQ5uAZ (Opinion piece by author of "The Great Influenza: The Story of the Deadliest Pandemic in History," noting comparison between current COVID-19 outbreak and the 1918 influenza outbreak widely considered one of the worst pandemics in

coronavirus, is estimated to be between 1 and 6%: about tenfold higher than that observed from a severe seasonal influenza that kills thousands a year.[5] As of 12 p.m. on April 5, 2020, there were 11,510 confirmed cases of COVID-19 in Pennsylvania and 150 deaths.[6] In Allegheny County, there were 642 cases and 4 deaths as of April 6, 2020.[7] These numbers likely underestimate the impact and spread of the virus, given the lack of testing.[8] The virus is spreading exponentially.[9] In fact, the number of confirmed COVID-19 cases in Allegheny County jumped 16% just between April 3 and April 4, 2020.[10] Without effective public health interventions, CDC projections

---

history). [5] As of April 6, 2020, there were 1,289,380 confirmed cases globally, with 70,590 deaths and 270,372 recoveries. Johns Hopkins University of Medicine, *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering at Johns Hopkins University*, https://cutt.ly/StEyn2U.; Exhibit A, Expert Declaration of Dr. Jonathan Louis Golob, M.D., ¶4. Dr. Golob is an Assistant Professor at the University of Michigan School of Medicine in Ann

[5] As of April 6, 2020, there were 1,289,380 confirmed cases globally, with 70,590 deaths and 270,372 recoveries. Johns Hopkins University of Medicine, *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering at Johns Hopkins University*, https://cutt.ly/StEyn2U.; Exhibit A, Expert Declaration of Dr. Jonathan Louis Golob, M.D., ¶4. Dr. Golob is an Assistant Professor at the University of Michigan School of Medicine in Ann Arbor, Michigan, and a specialist in infectious diseases and internal medicine with a subspeciality in infections in immunocompromised patients. [6] Amon Decl. ¶ 5. [7] https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx.

[6] Amon Decl. ¶ 5. [7] https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx.

[7] https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx.

[8] Amon Decl. ¶ 5.

[9] *See* Golob Decl. ¶ 2; Amon Decl. ¶ 5 ("There has been an exponential increase in cases and deaths in Pennsylvania over the past three weeks with the number of people infected increasing, on average by 32% every day.")[10] Paul Peirce, *Allegheny County reports 3rd covid-19 death, 16% jump in confirmed coronavirus cases in one day*, Trib Live (April 4, 2020), https://triblive.com/local/pittsburgh-allegheny/allegheny-county-reports-third-covid-19-death-16-jump-in-confirmed-coronavirus-cases-in-one-day/[11] Golob Decl. ¶ 11.

[10] Paul Peirce, *Allegheny County reports 3rd covid-19 death, 16% jump in confirmed coronavirus cases in one day*, Trib Live (April 4, 2020), https://triblive.com/local/pittsburgh-allegheny/allegheny-county-reports-third-covid-19-death-16-jump-in-confirmed-coronavirus-cases-in-one-day/[11] Golob Decl. ¶ 11.

indicate about 200 million people in the United States could be infected over the course of the epidemic, with as many as 1.5 million deaths in the most severe projections.[11]

15.　　The virus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[12] There is no vaccine against COVID-19, and there is no known medication to prevent or treat infection.[13] Social distancing—deliberately keeping at least six feet of space between persons to avoid spreading illness[14]—and a vigilant hygiene regimen, including washing hands frequently and thoroughly with soap and water, are the only known measures for protecting against transmission of COVID-19.[15]　Because the coronavirus spreads among people who do not show symptoms, staying away from people is the best way to prevent infection.[16]　In other words, *everyone*—including the staff at ACJ—has to act as if *everyone* has the disease.

16.　　COVID-19 can cause severe damage to lung tissue, including a permanent loss of respiratory capacity, and it can damage tissues in other vital organs, such as the heart and liver.[17]

17.　　People over the age of fifty face a greater risk of serious illness or death from COVID-19.[18] In a February 29, 2020 preliminary report, individuals age 50-59 had an overall

---

[11] Golob Decl. ¶ 11.
[12] Amon Decl. ¶ 16
[13] *Id.* at ¶6; Golob Decl. ¶ 10.
[14] Golob Decl. ¶10.
[15] *Id.*
[16] Amon Decl. ¶ 18.
[17] Golob Decl. ¶9.
[18] Golob Decl. ¶14; *see also* Amon Decl. ¶ 9 (observing that "those ≥54 years could be considered high risk for severe disease and death."

mortality rate of 1.3%; 60-69-year-olds had an overall 3.6% mortality rate, and those 70-79 years old had an 8% mortality rate.[19]

18.     People of any age are also at an elevated risk if they suffer from certain underlying medical conditions, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, or asthma.[20] An early report from the World Health Organization ("WHO") estimated the mortality rate of 13.2% for COVID-19 patients with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[21]

19.     In many people, COVID-19 causes fever, cough, and shortness of breath.[22] Most people in higher risk categories who develop serious illness will need advanced support.[23] This requires highly specialized equipment like ventilators that are in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians.[24]

20.     The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza.[25] According to recent estimates, the fatality

---

[19] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart, https://cutt.ly/ytEimUQ (data analysis based on WHO China Joint Mission Report).
[20] Amon Decl. ¶8; Golob Decl. ¶3, 14.
[21] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 28, 2020), at 12, https://cutt.ly/xtEokCt.
[22] Golob Decl. ¶5.
[23] *Id.* at ¶8.
[24] *Id.*
[25] *Id.* at ¶ 4.

rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.[26] For people in the highest risk populations, the fatality rate of COVID-19 infection is about 15 percent.[27] Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurologic damage, loss of digits, and loss of respiratory capacity.[28]

B. **The Release of Medically Vulnerable People is Necessary to Reduce the Grave and Immediate Danger that COVID-19 Will Result in Serious Harm or Death at ACJ**

21.    People in congregate environments—places where people live, eat, and sleep in close proximity—face increased danger of coronavirus infection and COVID-19, as already evidenced by the rapid spread of the virus in cruise ships and nursing homes.[29] It is virtually impossible for people who are confined in prisons, jails, and detention centers as presently constituted and run to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission of the disease.[30]

22.    Correctional settings further increase the risk of contracting COVID-19 because of the concentration of people with chronic, often untreated, illnesses in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, presence of many high-contact surfaces, and no possibility of staying at a distance from others.[31]

23.    Jails have generally proven to be incapable of implementing CDC recommendations, and incarcerated people are already dying nationwide as a result, including

---

[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.* at ¶ 12; Amon Decl. ¶ 23.
[30] *See* Amon Decl. at ¶ 23; Golob Decl. ¶ 13.
[31] Amon Decl. ¶¶ 22-23, 26, 40;

eight deaths of individuals incarcerated at two federal Bureau of Prisons facilities.[32] This is

demonstrated by dramatic outbreaks in the Cook County Jail and Rikers Island in New York City,

where the transmission rate for COVID-19 is estimated to be the highest in the world.[33]

24.     Outbreaks of the flu regularly occur in jails; during the H1N1 epidemic in 2009,

jails and prisons dealt with a disproportionately high number of cases.[34]

25.     Numerous public health experts, including Dr. Amon[35], Dr. Golob[36], Dr. Gregg

Gonsalves,[37] Ross MacDonald,[38] Dr. Marc Stern,[39] Dr. Oluwadamilola T. Oladeru and Adam

Beckman,[40] Dr. Anne Spaulding,[41] Homer Venters,[42] the faculty at Johns Hopkins schools of

---

[32] *See* Amon Decl. ¶ 31, 33; *COVID-19 Coronovirus*, Federal Bureau of Prisons, https://cutt.ly/itRSDNH; *see also, e.g.*, Lara Salahi, *2nd Mass. Inmate Dies of Coronavirus*, NBC Boston (April 5, 2020); Josiah Bates, *New York's Rikers Island Jail Sees First Inmate Death From COVID-19*, Time (April 6, 2020); Megan Crepeau and Jason Meisner, *Cook County Jail detainee dies of COVID-19*, Chicago Tribune (April 7, 2020 6:30 a.m.).[33] Amon Decl. ¶ 31; Golob Decl. ¶ 12.

[33] Amon Decl. ¶ 31; Golob Decl. ¶ 12.

[34] *See, e.g.,* Golob Decl., ¶ 13. This H1N1 "swine flu" pandemic outbreak spread dramatically in jails and prisons in 2010, but that strain of virus had a low fatality rate because of the characteristics of the virus—COVID-19's fatality rate is far higher. *See* David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few* (Feb. 15, 2010), https://cutt.ly/ytRSkuX.

[35] Amon Decl. ¶¶ 22-23, 34, 46.

[36] Golob Decl. ¶¶ 13-14.

[37] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak,* Connecticut Mirror (March 11, 2020), https://cutt.ly/BtRSxCF.

[38] Craig McCarthy and Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* New York Post (March 19, 2020), https://cutt.ly/ptRSnVo.

[39] Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington Assoc. of Sheriffs & Police Chiefs (March 5, 2020), https://cutt.ly/EtRSm4R.

[40] Oluwadamilola T. Oladeru, et al., *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind*, (March 10, 2020), https://cutt.ly/QtRSYNA.

[41] Anne C. Spaulding, MD MPDH, *Coronavirus COVID-19 and the Correctional Jail,* Emory Center for the Health of Incarcerated Persons (March 9, 2020).

[42] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, Mother Jones (March 12, 2020), https://cutt.ly/jtRSPnk.

nursing, medicine, and public health,[43] and Josiah Rich[44] have all strongly cautioned that people

booked into and held in jails are likely to face serious, even grave, harm due to the outbreak of

COVID-19.

26.    The only viable strategy to combat the spread of COVID-19 and prevent serious

harm or death to class members is risk mitigation.[45] Even with the most comprehensive plan to

address the spread of COVID-19 in detention facilities, the release of individuals who can be

considered at high-risk of severe disease if infected with COVID-19 is a key part of a risk

mitigation strategy.[46] Immediate release of the medically vulnerable population not only protects

them from transmission of COVID-19, but also allows for greater risk mitigation for people held

or working in the jail and the broader community.[47]

27.    Release of the most vulnerable people from custody also reduces the burden on the

region's health care infrastructure by reducing the likelihood that an overwhelming number of

people will become seriously ill from COVID-19 at the same time.[48]

---

[43] Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland, March 25, 2020, https://cutt.ly/stERiXk.

[44] Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons*, The Guardian (March 13, 2020 3:00 p.m.), https://cutt.ly/itRSDNH.

[45] *See* Amon Decl. ¶ 43.

[46] *Id*.

[47] *See id.* at ¶ 46.

[48] *See id.* at ¶ 41; This is especially important in Allegheny County as the county is already projected to face an unprecedented shortage of hospital beds in intensive care units. Krirs B. Maula and Anya Litvak, *Study: Pittsburgh region has far fewer hospital beds than needed for moderate COVID-19 outbreak* Pittsburgh Post-Gazette (March 22, 2020 6:00 a.m.) https://www.post-gazette.com/business/healthcare-business/2020/03/22/harvard-global-health-institute-univeristy-Pittsburgh-COVID-19-outbreak-hospital-beds/stories/202003180109.

28.     In the United States, jail administrators in Cuyahoga County, Ohio[49]; Los Angeles, California[50]; San Francisco, California[51]; Jefferson County, Colorado[52]; Montgomery, Alabama[53]; and the State of New Jersey,[54] among others, have concluded that widespread jail release is a necessary and appropriate public health intervention.

29.     Notwithstanding a population reduction of approximately 600 people in the last month from ACJ and the limited measures that Allegheny County has taken to prevent the introduction of COVID-19, immediate release of the medically vulnerable population remains a necessary public health intervention.[55]  Petitioners/Plaintiffs are at an increased risk of developing serious complications from coronavirus infection and COVID-19 due to their underlying medical conditions.[56]  Release is needed not only to prevent irreparable harm to members of the medically vulnerable subclass, but also to reduce the incarcerated population at ACJ sufficiently to ensure proper social distancing, which will reduce the likelihood of infection for all class members and the wider public.[57]

---

[49] Scott Noll, *Cuyahoga County Jail Releases Hundreds of Low-Level Offenders to Prepare for Coronavirus Pandemic*, (March 20 2020 6:04 p.m.), https://cutt.ly/CtRSHkZ.
[50] Alene Tchekmedyian, *More L.A. County Jail Inmates Released Over Fears of Coronavirus Outbreak,* L.A. Times, (March 19, 2020 6:55 p.m.), https://cutt.ly/ltRSCs6.
[51] Megan Cassidy, *Alameda County Releases 250 Jail Inmates Amid Coronavirus Concerns, SF to Release 26,* San Francisco Chronicle (March 20, 2020), https://cutt.ly/0tRSVmG.
[52] Jenna Carroll, *Inmates Being Released Early From JeffCo Detention Facility Amid Coronavirus Concerns*, KDVR Colorado (March 19, 2020 2:29 pm.), https://cutt.ly/UtRS8LE.
[53] *See In Re: COVID-19 Pandemic Emergency Response,* Administrative Order No. 4, Montgomery County Circuit Court (March 17, 2020).
[54] Erin Vogt, *Here's NJ's Plan for Releasing Up to 1,000 Inmates as COVID-19 Spreads* (March 23, 2020), https://cutt.ly/QtRS53w.
[55] *See* Amon Decl. ¶ 43.
[56] *Id*. at ¶¶ 10-15.
[57] *Id* at ¶ 45 ("Reducing the overall number of individuals in detention facilities will facilitate social distancing for remaining detainees[.]"). Further, in the prison context, the American Bar Association (ABA) urges that, "Governmental authorities in all branches in a jurisdiction should

12

**C. The Current Conditions of Confinement at ACJ Exacerbate the Extreme and
Imminent Danger Faced by Class Members of Contracting and Possibly Dying from
COVID-19**

30.    Even in the best of times, ACJ, like many urban detention facilities, is beset with

health problems and staffing challenges.  Ominously, however, officials there have exacerbated

and increased the risks to the health and life of class members during the current pandemic by

maintaining unconstitutional conditions of confinement that will increase the risk of class members

contracting COVID-19.

31.    More than 600 detainees have been released from the Allegheny County Jail over

the past month in recognition that coronavirus and COVID-19 pose significant risks in a jail.  But

Defendants-Respondents have not taken advantage of that release to implement social distancing

recommendations to keep detainees at least six feet apart.  Remarkably, they have done just the

opposite.  Failing to heed the unanimous recommendations of public health experts, Defendants-

Respondents have actually consolidated the remaining incarcerated population by moving them

closer together.[58]

32.    Defendants-Respondents are placing two detainees to a cell, even though empty

cells remain on the open floors.

33.    Defendants-Respondents have shuttered two entire floors of the jail instead of using

the cells on those floor to single cell prisoners and keep them a safe distance apart.[59]

---

take necessary steps to avoid crowding that… adversely affects the … protection of prisoners from
harm, including the spread of disease." ABA Standard on Treatment of Prisoners 23-3.1(b).

[58] Bob Mayo, *First on 4: 1500 Allegheny County Jail Inmates not being spread out, despite release
of 700* (Apr 2, 2020), https://www.wtae.com/article/first-on-4-1500-allegheny-county-jail-
inmates-not-being-spread-out-despite-release-of-700/32018165# (quoting email from Defendant
Harper noting that first floor had been closed "late last week").

[59] The seventh floor housing pods have not been in use since prior to the emergence of the COVID-
19 threat.

34.     On information and belief, Defendants-Respondents have reduced staffing levels at ACJ as a result of the population decrease.

35.     The actions of Defendants-Respondents are undermining one of the primary purposes of the county courts' release efforts, namely, to open up space inside the jail to enable safe social distancing.

36.     On information and belief, at this time, the majority of occupied cells at ACJ currently house two people, even though empty cells remain available, both on currently open pods as well as on the pods ACJ recently closed.[60]

37.     The cells at ACJ are not big enough to allow cellmates to stay six feet apart.  The beds are bunk-style, and the remainder of the cell contains a desk, toilet, and a sink.[61]

38.     Meals are distributed on the pod and eaten at tables in the dayroom. Up to 100 people may be on the pod during meals. Even on those pods where only half of the population is released for meals at one time, there are typically 40-50 people out together. The tables on the pod are small, approximately 4 square feet, which means people are forced to eat more closely together than recommended.[62]

39.     Likewise, up to 100 people recreate together, many in close contact. Group recreation is continuing. Some pods very recently began to split recreation, but even that measure leaves 40-50 people in close contact and not able to the maintain six-foot distance between them.[63]

---

[60] *See* Exhibit C, Declaration of Alexus Diggs, at ¶¶ 4, 15; Exhibit D, Declaration of Heather Connolly at ¶¶ 5, 14, 17; Exhibit E, Declaration of Larnell Jones, at ¶ 9; Exhibit F, Declaration of Michael Graham, at ¶¶ 16-17; Exhibit G, Declaration of Terry Suggs at ¶¶ 8, 10.
[61] Connolly Decl. ¶ 6; Suggs Decl. ¶ 9.
[62] Suggs Decl. ¶¶ 11, 13; Jones Decl. ¶¶ 11, 13; Graham Decl. ¶¶ 14-15; Amon Decl. ¶26.
[63] Suggs Decl. ¶¶ 11-12; Jones Decl. ¶¶ 11-12; Graham Decl. ¶ 15.

40.     People are also crowded together at the communal phones, standing elbow-to-elbow with others when making calls.  As visitation has been suspended, these phone calls are the only means remaining for individuals to communicate quickly with their worried families.  Phones are not being disinfected or in any way sanitized between the calls.[64]

41.     Showers are shared by people housed on the unit, and they are not disinfected between uses, increasing the chances of transmission.[65]

42.     There is currently no COVID-19 testing performed on ACJ employees.[66] This presents a daily risk of introduction of coronavirus into ACJ. Upon information and belief, ACJ is taking staff members' temperature upon their entrance to the jail, but the possibility of asymptomatic transmission means that monitoring fever of staff or detainees is inadequate to identify all who may be infected and thereby reduce the risk of transmission.[67]  This is also true because not all individuals infected with COVID-19 present with fever in early stages of infection.[68]

43.     The lack of proven cases of COVID-19 where there is little to no testing is functionally meaningless to determine if there is a risk for COVID-19 transmission both in the jail and in the community.  In other jurisdictions where testing has been made available to correctional

---

[64] Suggs Decl. ¶ 16; Jones Decl. ¶ 16-18; Graham Decl. ¶ 15.
[65] Connolly, Decl. ¶ 20; Suggs Decl. ¶ 17; Jones Decl. ¶ 1; Graham Decl. ¶ 17; Diggs Decl. ¶ 18.
[66] Exhibit H, Allegheny County Jail, Continuing of Operations Plan: COVID-19 (Updated), March 30, 2020, at 3-4 (describing employee screening involving temperature taking and questions, then noting that for employees who cannot work with a fever, "Testing can also be arranged through the Allegheny County Health Department.")
[67] Amon Decl. ¶ 29.
[68] *Id.* ("The possibility of asymptomatic transmission means that monitoring fever of staff or detainees is inadequate for identifying all who may be infected and preventing transmission.").

officers who enter and leave facilities regularly, the rates of infection are high.[69]  These officers are further vectors of the virus: like detainees, they may be asymptomatic while still contagious.

44.     At least one corrections officer has tested positive for COVID-19 and several others have been isolated as a result.[70]  On information and belief, ACJ has made absolutely no effort to identify, notify, or isolate incarcerated detainees who may also have come in contact with any of those corrections officers.

45.     On information and belief, corrections officers who are exhibiting respiratory symptoms and fever are still interacting with and escorting incarcerated people in the jail.

46.     ACJ's existing intake and isolation procedures are grossly inadequate to prevent COVID-19 in the facility.[71]  For example, a 57-year-old man who was recently admitted to the jail spent only four days in intake before placement in a general housing pod with a medically vulnerable cellmate.[72]

47.     ACJ staff also have not provided basic but critical information or education to the incarcerated population about COVID-19.[73]  Indeed, no staff even informed the incarcerated population about COVID-19 until March 31st or April 1st.[74]  These belated communications did not include any medical information for the population about COVID-19, its symptoms, the reason for social distancing (or even what the term means), the need to increase personal hygiene, the fact

---

[69] Amon Decl.  ¶¶ 31-33.
[70] Paula Reed Ward, *Jail employee tests positive for COVID-19*, Pittsburgh Post-Gazette (March 28, 2020 9:06 a.m.) https://www.post-gazette.com/news/crime-courts/2020/03/28/Jail-employee-tests-positive-for-COVID-19/stories/202003280036.
[71] *See* Exhibit H at 4-5; Amon Decl. ¶¶ 29-30.
[72] Suggs Decl. ¶ 8.
[73] Diggs Decl. ¶7; Connoly Decl. ¶ 16; Jones Decl. ¶¶ 14-15; Graham Decl. ¶8; Suggs Decl. ¶¶ 14-15.
[74] Diggs Decl. ¶¶ 7-13.

that people can be asymptomatic carriers, or the importance of reporting symptoms consistent with

COVID-19 as soon as they are experienced.[75]

48.    In fact, Plaintiffs Diggs and Connolly had not heard the term "social distancing"

before speaking with counsel on Saturday, March 28.[76]

49.    As of April 1, reports emerged that some staff finally began to order incarcerated

people to maintain a six-foot distance from each other or staff.[77]

50.    On April 1, Defendant Harper came onto pod 4F and personally ordered everybody

to stand six-feet apart or else they would all be locked down.[78] He was questioned about double-

celling and group recreation and meals but only responded by saying he will not discuss

"technicalities."[79]

51.    Neither the detainees nor staff are required to wear masks. Upon information and

belief, not all detainees have been provided with masks, and those detainees who have been issued

masks have not been instructed on their effective and adequate use.[80] Defendants-Respondents did

not provide staff or incarcerated people with any personal protective equipment (PPE), including

masks, until Saturday, April 4.[81] Staff passed out these masks with bare hands and did not provide

people with instructions on how to put them on and remove them, or use them effectively.[82]

Detainees are not required to wear masks, and neither are staff.[83]

---

[75] *Id.*
[76] *Id.* at ¶ 7; Connolly Decl. ¶ 16.
[77] *See e.g.,* Diggs Decl. ¶¶ 9-13.
[78] *Id.*
[79] *Id*
[80] Id.
[81] Connolly Decl. ¶ 18; Graham Decl. ¶ 18.
[82] Connolly Decl. ¶ 18; Graham Decl. ¶ 18.
[83] *Id.*

52.     On information and belief, staff have previously been specifically instructed NOT to wear masks within the facility, to avoid causing concern in the incarcerated population.  At least one corrections officers was recently disciplined by Defendant Harper for refusal to conduct searches of cells without a mask.

53.     Defendants-Respondents permits detainees access to only one bar of soap and one roll of toilet paper per week.[84] This rationing has been inadequate to meet peoples' needs.[85] For example, Plaintiff Graham has been without a bar of soap since April 1st, and another detainee reported that a fight broke out in his housing pod over limited toilet paper after somebody had run out.[86]

54.     Further, Defendants-Respondents have not consistently or effectively increased sanitation measures at ACJ since the onset of COVID-19, with people reporting that cleaning of common areas depends on the staff on duty, as not all staff carry out enhanced cleaning measures.[87]

55.     Incarcerated people are denied access to cleaning supplies for their own cells.[88] Cleaning is supposed to happen weekly, but this does not regularly occur.[89]

56.     ACJ medical services are woefully inadequate to address a significant COVID-19 outbreak at the jail. As of February 26, 2020, the jail had 48 health care vacancies out of an expected health care staff of approximately 136 full and part-time positions.[90] That means around

---

[84] Diggs. Decl. ¶ 14 (noting that staff recently confiscated second rolls of toilet paper); Graham Decl. ¶ 16; Suggs Decl. ¶ 20.
[85] Diggs. Decl. ¶ 14 (ran out of toilet paper); Graham Decl. ¶16 (ran out of soap); Suggs Decl. ¶ 22 ("People have run out of toilet paper in the middle of the week and have taken to using request forms to wipe themselves.").
[86] Graham Decl. ¶ 16; Suggs Decl. ¶¶ 20-22.
[87] Connolly Decl.¶ 21; Diggs. Decl. ¶ 19; Graham Decl. ¶ 19.
[88] Diggs Decl. ¶ 17; Connolly Decl. ¶ 19; Jones ¶ 20; Graham Decl. ¶19; Suggs Decl. ¶ 18.
[89] Suggs Decl. ¶18.
[90] Exhibit I, ACJ Employees List & ACJ Health Vacancies.

one-third of all health care positions at the jail are vacant, though the situation may be even worse due to the substantial number of leadership and full-time positions that are vacant. These vacancies include the Health Services Administrator, the Director of Nursing,  6 full time Licensed Practical Nurses (LPN); 2 part-time LPNs; 4 full-time Medical Assistants; 3 part-time Medical Assistants; 6 full-time Registered Nurses; 8 part-time Registered Nurses; 2 full-time Assistant Directors of Nursing; 2 full-time Administrative Assistants.[91] This shortage of medical staff results in often delayed medical care at the jail.[92]

57.     Even prior to the pandemic, delayed and denied medical care was a chronic problem at ACJ.  These systemic failings are only worsened by the extensive care required by COVID-19.

58.     Defendants-Respondents fail to adequately treat and quarantine individuals presenting with COVID-19 symptoms.[93] Individuals report remaining in their cells, with cellmates, receiving infrequent visits and temperature checks from healthcare staff.[94]

59.     For example, Plaintiff Connolly began feeling ill in mid-March and felt slightly feverish for 7-10 days.[95]

---

[91] Id.

[92] Health care staffing assessment based on data obtained from the Jail Oversight Board on vacancies and current employees and attached as Ex. H.

[93] Ex. H at 11 ("Individuals will remain locked in their cells and separated from the general population…. If an individual is diagnosed with COVID-19, medication pass will be conducted at their cell door." and noting that inmate will be provided with a mask only when they are sick enough to require transport to a hospital.); see Amon Decl. ¶35 ("In cases where there are confirmed or suspected cases of COVID-19, the CDC recommends medical isolation, defined by the CDC confining the case "ideally to a single cell with solid walls and a solid door that closes" to prevent contact with others and to reduce the risk of transmission. Individuals in isolation should also be provided their own bathroom space."); ¶¶ 37-38 (noting that incarcerated people should wear face masks "at all times" when in close contact of suspected cases).

[94] See Connolly Decl. ¶¶ 4-9.

[95] Id. at ¶ 4.

19

60.     Nonetheless, she only had her temperature taken once during this time, on March 22, when she was found to have a slightly elevated fever. She was subsequently locked in her cell, with her cellmate, for three days.[96]

61.     While locked in her cell she never again had her temperature taken, although she continued to feel feverish.[97]

62.     During this time Ms. Connolly felt other adverse health symptoms, including shortness of breath, nausea resulting in vomiting, and loss of appetite.[98]

63.     Ms. Connolly was never taken to the infirmary, or otherwise provided any medical care.[99]

64.     Ms. Connolly also reported that her cellmate had a high fever and was suffering extreme shortness of breath. Her cellmate was eventually taken to the infirmary.[100]

65.     No further precautions were taken for those confined on her pod or who otherwise had interaction with either Ms. Connolly or her cellmate.[101]

66.     Another person was moved into Ms. Connolly's cell shortly after her cellmate was taken to the infirmary. Her new cellmate has a colostomy bag and serious medical conditions.[102]

---

[96] *Id*. at ¶ 5.
[97] *Id*. at ¶ 7.
[98] *Id*. at ¶ 8. According to a study published in *The American Journal of Gastroenterology*, digestive symptoms, including vomiting and loss of appetite appeared in slightly more than 50% of a cohort of 204 patients diagnosed with Covid-19. *See* "Covid-19: 'digestive symptoms are common', Maria Cohut, March 20, 2020, https://www.medicalnewstoday.com/articles/covid-19-digestive-symptoms-are-common.
[99] Connolly Decl. ¶ 9.
[100] *Id*. at ¶ 11.
[101] *Id*. at ¶ 13.
[102] *Id*. at ¶ 14.

67.     The cell was not cleaned or disinfected prior to her new cellmate's arrival.[103]

68.     Despite displaying these symptoms, Ms. Connolly was never tested for COVID-19.[104]

69.     Similarly, putative class member Terry Suggs, a 35-year-old man held as a pretrial detainee at ACJ on nonviolent charges, had a fever last week and was not seen by medical staff for over 5 days. When he was finally seen, medical staff said the fever was caused by his high blood pressure.[105]

70.     Mr. Suggs has been diagnosed with asthma, diabetes and hypertension, conditions that have substantially limited his respiratory, digestive and circulatory systems, placing him at high risk of severe illness or death if he contracts COVID-19.[106]

71.     Medical staff did not provide any follow up care to Mr. Suggs and did not take his temperature again.[107]

72.     Mr. Suggs was not placed in isolation and no precautions were taken for those who were confined on the same pod or who otherwise had interaction with Mr. Suggs.[108]

73.     Given the near insurmountable burden that COVID-19 has placed on healthcare systems across the world, there is a near-certain risk that ACJ's under-resourced healthcare staff will be overwhelmed by COVID-19.

---

[103] *Id.*
[104] *Id.* at ¶ 15.
[105] Suggs Decl. ¶ 24.
[106] Amon Decl. ¶ 14.
[107] *Id.*
[108] *Id.*

74.     Defendants-Respondents have failed to respond to and manage the continued risk of harm posed by the COVID-19 outbreak by following public health guidelines from the Centers for Disease Control and Prevention ("CDC").[109]  The guidelines require: (a) providing all incarcerated persons a six-foot radius (113 ft$^2$) or more of distance from any other persons, including during meals, transportation, court sessions, recreation, counts, and all other activities; (b) instituting a safety plan to prevent a COVID-19 outbreak in the ACJ in accordance with CDC guidelines; (c) making sanitation solutions readily available, without charge, for the purposes of cleaning cell, dormitory, laundry, and eating areas, including sufficient antibacterial soap, and lifting any ban on alcohol-based hygiene supplies (e.g. hand sanitizer, cleaning wipes); (d) providing adequate and appropriate COVID-19 testing for incarcerated persons, jail staff, and visitors; (e) waiving all medical co-pays for those experiencing COVID-19 like symptoms; and (f) providing sufficient personal protective equipment, particularly masks, and to all staff and incarcerated people.[110]

## IV.     CLASS ACTION ALLEGATIONS

75.     Plaintiffs Graham, Diggs, and Connolly bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedures on behalf of themselves and a class of similarly situated individuals.

76.     Plaintiffs Graham, Diggs, and Connolly seek to represent a class of all current and future detainees held in custody at ACJ ("Class"), including two subclasses: (1) persons who, by

---

[109] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.
[110] Amon Decl. ¶¶ 24-25, n. 29.

reason of age or medical condition, are particularly vulnerable to injury or death if they were to contract COVID-19 ("Medically-Vulnerable Subclass"), and (2) persons who, by reason of their disability, are particularly vulnerable to injury or death if they were to contract COVID-19 ("Disability Subclass).

77.   The "Medically Vulnerable" subclass is defined as all current and future persons held at ACJ who are 55 and older,[111] as well as all current and future persons held at ACJ of any age who have been diagnosed with: (a) lung disease, including asthma, chronic obstructive pulmonary disease (e.g. bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure and coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; and/or (l) a current or recent (last two weeks) pregnancy.  All plaintiffs represent the Medically Vulnerable Subclass.

78.   The "Disability" subclass is defined as all current and future persons held at ACJ who have a physical impairment that substantially limits one or more of their major life activities and who are at increased risk of COVID-19 illness, injury, or death due to their disability or any medical treatment necessary to treat their disability, including but not limited to those who have been diagnosed with:  (a) lung disease, including asthma, chronic obstructive pulmonary disease

---

[111] Amon Decl. ¶ 9.

23

(e.g. bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure and coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders and/or (i) developmental disability.[112] All plaintiffs represent the Disability Subclass.

79. This action has been brought and may properly be maintained as a class action under Federal law. It satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

80. Joinder is impracticable because (1) the classes are numerous; (2) the classes include unidentifiable future members; and (3) the class members are incarcerated, rendering their ability to institute individual lawsuits limited, particularly in light of the cessation of legal visitation and court closures in Allegheny County.

81. On information and belief, there are at least 1700 people in the proposed Pretrial Class. The information as to the exact size of the class and sub-class and the identity of the individuals therein are in the exclusive control of the Defendants.

82. Common questions of law and fact exist as to all members of the proposed classes: All have the right to receive adequate COVID-19 prevention, testing, and treatment.

---

[112] The disability subclass is separate and apart from the medically vulnerable class as age, and some conditions within the medically vulnerable class, such as pregnancy, are not factors that place a person under the ambit of the ADA's protections.

83.     Plaintiffs' claims are typical of the members of the class because Plaintiffs and all class members are injured by the same wrongful acts, omissions, polices, and practices of Defendants-Respondents as described in this Complaint.  Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the class members, and are based on the same legal theories.

84.     Plaintiffs Graham, Diggs, and Connolly have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class. They have no interests adverse to the interests of the proposed class. They retained *pro bono* counsel with experience and success in the prosecution of civil rights litigation.  Counsel for Plaintiffs know of no conflicts among proposed class members or between counsel and proposed class members.

85.     Defendants have acted on grounds generally applicable to all proposed class members, and this action seeks declaratory and injunctive relief.  Plaintiffs Graham, Diggs, and Connolly therefore seek class certification under Rule 23(b)(2).

86.     In the alternative, the requirements of Rule 23(b)(1) are satisfied, because prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of contact for the party opposing the proposed classes.

## V.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Unconstitutional Conditions of Confinement in Violation of the Fourteenth Amendment to the U.S. Constitution**
42 U.S.C. § 1983/28 U.S.C. § 2241
*Class & Medically Vulnerable Subclass versus All Defendants*

87.     Under the Fourteenth Amendment, corrections officials are required to provide for the reasonable health and safety of persons in pretrial custody. *Youngberg v. Romeo*, 457 U.S. 307,

315–16, 324 (1982)). Correctional officials thus have an affirmative obligation to protect persons in their custody from infectious disease. Officials violate incarcerated individuals' rights when they are deliberately indifferent to conditions of confinement that are likely to cause them serious illness and that pose an unreasonable risk of serious damage to their future health. *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993)

88.     Defendants-Respondents' actions in confronting the COVID-19 threat have been worse than deliberately indifferent. Defendants-Respondents have misused the opportunity provided by Allegheny County courts in reducing its population by 600 people. Rather than take advantage of the additional space to operationalize the recommended social distancing, Defendants-Respondents have consolidated incarcerated persons, thereby intentionally increasing risk of likely contagion and the severe resulting health consequences.

89.     Moreover, ACJ, as currently operated, is unable to comply with public health guidelines to prevent an outbreak of COVID-19, and Defendants-Respondents have not and cannot provide for the safety of the Class.  Defendants-Respondents have not taken appropriate steps to test for, treat, or prevent COVID-19 outbreaks, and Defendants-Respondents are unable to protect the sub-class of medically vulnerable inmates from serious harm caused by COVID-19, in violation of their constitutional obligation to provide humane conditions of confinement for the Class.

90.     Accordingly, Defendants have violated the rights of the Class under the Fourteenth Amendment.

**SECOND CLAIM FOR RELIEF**

**Unconstitutional Punishment in Violation of the Fourteenth Amendment to the U.S. Constitution**
42 U.S.C. § 1983/28 U.S.C. § 2241
*Class & Medically Vulnerable Subclass versus All Defendants*

91.     Under the Fourteenth Amendment, persons in pretrial custody have greater due process protections than those convicted and therefore cannot be punished as part of their detention.  *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979).   A Defendant has punished Plaintiffs when the conduct is either not rationally related to a legitimate, non-punitive governmental purpose or excessive in relation to that purpose.

92.     Even assuming that Defendants-Respondents' spacing and provision of medical services inside ACJ normally serves the legitimate, non-punitive purpose of health and safety of detained persons, ACJ, as currently operated, has been deliberately indifferent to and is unable to comply with public health guidelines to prevent an outbreak of COVID-19. Therefore, continuing to detain Class members under conditions of confinement that are inconsistent with COVID-19-specific guidance from public health experts is not rationally related to, and excessive in relation to, that purpose.

93.     Accordingly, Defendants have violated the rights of the Class under the Fourteenth Amendment.

**THIRD CLAIM FOR RELIEF**

**Violation of the Americans with Disabilities Act**
42 U.S.C. §§ 12101 et seq
*Disability Subclass versus Defendant Allegheny County*

94.     Title II of the ADA requires public entities, like ACJ, to reasonably accommodate people with disabilities in all programs and services for which people with disabilities are otherwise qualified.

95.     Plaintiffs, and other members of the Class, are qualified individuals with a disability under the meaning of the ADA.

96.     Access to medical treatment and safe conditions of confinement are programs or services that ACJ must provide to incarcerated people for purposes of the ADA.

97.     Defendants intentionally discriminate against people with disabilities by intentionally denying them reasonable accommodations recommended by the CDC and necessary to protect themselves from COVID-19.

98.     If the population is reduced to allow for adequate social distancing,  reasonable accommodations recommended by the CDC and necessary to protect people with disabilities include, but are not limited to: single celling, provision of cleaning supplies, access to soap to facilitate handwashing, and staggered dining and recreation times in numbers that permit social distancing.

99.     Failing to provide these reasonable accommodations is illegal discrimination under the ADA entitling Plaintiffs and members of the Disability Subclass to injunctive and declaratory relief.

## VI.     REQUEST FOR RELIEF

100.    Plaintiffs/Petitioners  Graham,  Diggs,  and  Connolly  and  Class  Members respectfully request that the Court order the following:

1.  Certification of this Petition as a Class Action.

2.  A preliminary injunction, permanent injunction, and/or writs of habeas corpus requiring Defendants-Respondents  to  immediately  release  all  Medically  Vulnerable  Subclass Members, absent proof of recorded judicial findings that the individual poses a risk of flight

or danger to others that no other conditions can mitigate, and ordering that Defendants-Respondents provide these individuals with educational resources on COVID-19, including instructions that they should self-isolate for the CDC-recommended period of time (currently 14 days) following release.

3. A preliminary injunction directing any further action required to release Class Members outside the Medically Vulnerable Subclass to ensure that all remaining persons are incarcerated in Allegheny County Jail under conditions consistent with CDC guidance to prevent the spread of COVID-19, including requiring that all persons be able to maintain six feet or more of space between them.

4. A preliminary injunction enjoining Defendants-Respondents from confining more than one person in a cell until such time as the danger of contagion from COVID-19 recedes sufficiently to lift social distancing requirements.

5. A preliminary injunction directing Defendant-Respondents to submit a plan to the Court within five days, to be overseen by a qualified public health expert pursuant to Fed. R. Evid. 706, which outlines:

    a. Specific mitigation efforts, in line with CDC guidelines, to significantly reduce the risk of contraction of COVID-19 by all Class Members not immediately released;

    b. A housing and/or public support plan for any released Class or Subclass Members whose testing confirms they have been exposed to or infected with COVID-19 and who do not readily have a place to self-isolate for the CDC-recommended period of time (currently 14 days); and

    c.   An evaluation of whether the release of the Subclass Members permits social distancing and whether other categories of prisoners must be released to provide for compliance with CDC guidelines.

6.   If immediate release is not granted on the basis of this Petition alone, then expedited review of the Petition, including an evidentiary hearing and/or oral argument, via telephonic or videoconference if necessary.

7.   A declaration that Defendants-Respondents policies violate the Fourteenth Amendment rights to reasonable safety and to be free from punishment prior to conviction with respect to the Class and/or Medically Vulnerable Subclass.

8.   A declaration that Defendants-Respondents' policies violate the Americans with Disabilities Act with respect to the Disability Subclass.

9.   An award of Petitioners/Plaintiffs' attorney fees and costs under 42 U.S.C. § 1988, 42 U.S.C. § 12205, and other applicable law.

10. Any further relief this Court deems just and appropriate.

Dated: April 7, 2020

                       Respectfully submitted,

                       */s/ Alexandra Morgan-Kurtz*
                       Alexandra Morgan-Kurtz, Esq.
                       PA ID No. 312631
                       **Pennsylvania Institutional Law Project**
                       100 Fifth Ave, Ste. 900
                       Pittsburgh, Pa 15222
                       T: (412) 434-6175
                       amorgan-kurtz@pailp.org

/s/ Bret Grote
Bret D. Grote, Esq.
PA ID No. 317273
/s/ Quinn Cozzens
Quinn Cozzens, Esq.
PA ID No. 323353
/s/ Jaclyn Kurin*
Jaclyn Kurin, Esq.
D.C. Bar ID No. 1600719
/s/ Jules Lobel,*
Jules Lobel, Esq.
Of Counsel
N.Y. Bar No. 1262732
/s/ Swain Uber
Swain Uber, Esq.
Of Counsel
PA I.D. No. 323477
**Abolitionist Law Center**
P.O. Box 8654
Pittsburgh, PA 15221
T: (412) 654-9070
bretgrote@abolitionistlawcenter.org
qcozzens@alcenter.org
jkurin@alcenter.org
jll4@pitt.edu
swain.uber@gmail.com

*pro hac vice admission pending

/s/ Sara J. Rose
Sara J. Rose, Esq.
PA ID No.: 204936
/s/ Witold J. Walczak
Witold J. Walczak, Esq.
PA ID No.: 62976
**American Civil Liberties Union of Pennsylvania**
PO Box 23058
Pittsburgh, PA 15222
T: (412) 681-7864 (tel.)
F: (412) 681-8707
srose@aclupa.org
vwalczak@aclupa.org

David C. Fathi*
dfathi@aclu.org

31

**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,
NATIONAL PRISON PROJECT**
915 15th Street N.W. 7th Floor
Washington, DC 20005
(202) 548-6603

*Not admitted in DC; practice limited to federal
courts

Sozi Pedro Tulante, Esq.
PA ID No. 202579
Will W. Sachse, Esq.
PA ID No.: 84097
Cory A. Ward, Esq.
PA ID No. 320502
Ryan M. Moore, Esq.
PA ID No. 314821
Rachel Rosenberg, Esq.
PA ID No. 322960
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
T: (215) 994-2496
F: (215) 665-2496
Sozi.tulante@dechert.com
will.sachse@dechert.com
cory.ward@dechert.com
*pro hac vice pending*

*Attorneys for Petitioners/Plaintiffs*