**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MICHAEL GRAHAM; ALEXUS DIGGS; and HEATHER CONNOLLY, *on behalf of themselves and all others similarly situated*, <br><br> *Plaintiffs-Petitioners*, <br><br> v. <br><br> ALLEGHENY COUNTY; and ORLANDO HARPER, *Warden of Allegheny County Jail*, <br><br> *Defendants-Respondents*. | Civil Action No. 2:22-cv-00496-CRE <br><br> **ELECTRONICALLY FILED** <br><br> **IMMEDIATE RELIEF SOUGHT** |

**PLAINTIFFS-PETITIONERS' BRIEF IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ............................................................................1

FACTUAL BACKGROUND............................................................................4

I.      COVID-19 POSES A GRAVE RISK OF SERIOUS INJURY AND DEATH TO
        THOSE INFECTED, ESPECIALLY INDIVIDUALS LIKE PETITIONERS,
        WHO ARE MEDICALLY VULNERABLE OR OVER THE AGE OF 55. ..........5

II.     THE CONDITIONS AT JAILS AND DETENTION FACILITIES LIKE ACJ
        PLACE ALL PERSONS DETAINED THERE AT AN EVEN GREATER AND
        IMMEDIATE RISK OF COVID-19 INFECTION THAN MEMBERS OF THE
        PUBLIC-AT-LARGE. ...........................................................................8

III.    THE CURRENT CONDITIONS IN WHICH DEFENDANTS HAVE
        CONFINED PETITIONERS AND CLASS MEMBERS IN ACJ ONLY
        EXACERBATE THE ALREADY EXTREME AND IMMINENT DANGER
        THEY FACE OF CONTRACTING AND POSSIBLY DYING FROM COVID-
        19...........................................................................................10

        A.    Defendants Have Refused To Take The Most Basic Precautions, Like
              Social Distancing, To Limit The Spread Of COVID-19 In The ACJ........11

        B.    Defendants Maintain Dangerous, Unsanitary Conditions At ACJ And Do
              Not Provide Appropriate Medical Care. ....................................13

        C.    Defendants Do Not Properly Intake, Test, And Quarantine Persons
              Suspected Of COVID-19 Infection............................................14

        D.    Petitioners And Other Members Of The Medically Vulnerable Subclass
              Must Be Released From Custody Immediately, Given Their Heightened
              Risk Of Becoming Critically Ill Or Dying If Infected By COVID-19. .....16

LEGAL STANDARD...........................................................................17

ARGUMENT ....................................................................................18

I.      PETITIONERS AND MEMBERS OF THE PROPOSED CLASS ARE
        ENTITLED TO EQUITABLE RELIEF TO PREVENT THEM FROM
        INFECTION, DEATH, OR SERIOUS COMPLICATIONS FROM COVID-19. 18

        A.    Petitioners' Likelihood Of Success On The Merits Warrants Immediate
              Injunctive Relief................................................................18

        B.    The Heightened Risk Of Infection From A Potentially Lethal Virus With
              No Vaccine Or Cure Is Irreparable Harm. .................................34

        C.    The Public Interest Is Best Served By Minimizing The Spread Of COVID-
              19 Through Social Distancing And Hygiene Practices, But Those Steps
              Are Impossible At ACJ.........................................................38

D.      The Balance Of Equities Favors Granting Relief To The Proposed
        Class. ............................................................................................................41

CONCLUSION ............................................................................................................43

# TABLE OF AUTHORITIES

**CASES**

*Allegheny Cty. Sanitary Auth. v. U.S.E.P.A.*,
  732 F.2d 1167 (3d Cir. 1984)..........................................................................39

*Am. Freedom Def. Initiative v. Se. Pa. Transp. Auth.*,
  92 F. Supp. 3d 314 (E.D. Pa. 2015) ...............................................................43

*Aruanno v. Johnson*,
  683 F. App'x 172 (3d Cir. 2017) ....................................................................23

*Avendano Hernandez v. Decker*,
  No. 20-1589, 2020 WL 1547459 (S.D.N.Y. Mar. 31, 2020)..........................32

*Basank v. Thomas*,
  No. 20-02518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020)................ passim

*Bell v. Wolfish*,
  441 U.S. 520 (1979)........................................................................................20

*Belton v. Georgia*,
  No. 10-0583, 2012 WL 1080304 (N.D. Ga. March 20, 2012).........................29

*Bowers v. Nat'l Collegiate Athletic Ass'n*,
  118 F. Supp. 2d 494 (D.N.J. 2000), *opinion amended on reargument*,
  130 F. Supp. 2d 610 (D.N.J. 2001) .................................................................28

*Bowers v. NCAA*,
  475 F.3d 524 (3d Cir. 2007).............................................................................25

*Brown v. Plata*,
  563 U.S. 493 (2011).........................................................................................18

*Castillo v. Barr*,
  No. 20-00605, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020)................ passim

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ........................................................................42

*Chisolm v. McManimon*,
  275 F.3d 315 (3d Cir. 2001).......................................................................25, 29

*Chmiel v. Pennsylvania Dep't of Corr.*,
  No. 18-1691, 2020 WL 1332830 (W.D. Pa. Mar. 23, 2020) ..........................25

*Coreas v. Bounds*,
    No. TDC-20-0780 (D. Md. Apr. 3, 2020)......................................................37

*Coronel v. Thomas*,
    No. 20-2472, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020)..............32, 38, 42

*Derrick F. v. Red Lion Area Sch. Dist.*,
    No. 06-1463, 2006 WL 2547050 (M.D. Pa. Sept. 1, 2006)............................34

*Dodd v. Derose*,
    No. 15-01088, 2015 WL 5029364 (M.D. Pa. Aug. 25, 2015) .......................32

*Doe v. Boyertown Area Sch. Dist.*,
    897 F.3d 518 (3d Cir. 2018)..........................................................................42

*Doe v. Nat'l Bd. of Med. Examiners*,
    199 F.3d 146 (3d Cir. 1999)..........................................................................34

*E.D. v. Sharkey*,
    928 F.3d 299 (3d Cir. 2019)..........................................................................20

*Furgess v. Pa. Dep't of Corr.*,
    933 F.3d 285 (3d Cir. 2019)..........................................................................27

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
    425 F.3d 158 (2d Cir. 2005)..........................................................................39

*Haberle v. Troxell*,
    885 F.3d 171 (3d Cir. 2018)....................................................................27, 29

*Harris v. Cty. of Atlantic*,
    No. 15-574, 2015 WL 715781 (D.N.J. Feb. 19, 2015) ..................................32

*Helen L. v. DiDario*,
    46 F.3d 325 (3d Cir. 1995)............................................................................29

*Hernandez v. Wolf*,
    No. 20-00617 (C.D. Cal. Apr. 1, 2020) .........................................................21

*Holland v. Rosen*,
    277 F. Supp. 3d 707, 738 (D.N.J. 2017) .......................................................32

*Hornstine v. Twp. of Moorestown*,
    263 F. Supp. 2d 887 (D.N.J. 2003) ...............................................................34

*Hubbard v. Taylor*,
    399 F.3d 150 (3d Cir. 2005)..............................................................20, 28, 29

*Hutto v. Finney*,
  437 U.S. 678 (1978)..................................................................18

*Issa v. Sch. Dist. of Lancaster*,
  847 F.3d 121 (3d Cir. 2017).......................................................18

*Johnson v. Wetzel*,
  209 F. Supp. 3d 766 (M.D. Pa. 2016)........................................32

*Jones v. Wolf*,
  No. 20-361, 2020 WL 1643857 (W.D.N.Y. Apr. 2, 2020)............38

*Leamer v. Fauver*,
  288 F.3d 532 (3d Cir. 2002)................................................31, 32

*McCoy v. Tex. Dep't Crim. Justice*,
  No. 05-370, 2006 WL 2331055 (S.D. Tex. Aug. 9, 2006) ............30

*Natale v. Camden Cty. Corr. Facility*,
  318 F.3d 575 (3d Cir. 2003).......................................................23

*Pa. Dep't of Corr. v. Yeskey*,
  524 U.S. 206 (1998)..................................................................25

*Padilla v. Immigration & Customs Enf't*,
  No. 19-35565, 2020 WL 1482393 (9th Cir. Mar. 27, 2020)..........37

*Preiser v. Rodriquez*,
  411 U.S. 475 (1973)..................................................................31

*Presta v. Peninsula Corridor Joint Powers Bd.*,
  16 F. Supp. 2d 1134 (N.D. Cal. 1998) .......................................29

*Ramsey v. City of Pittsburgh, Pa.*,
  764 F. Supp. 2d 728 (W.D. Pa. 2011)........................................39

*Raytheon Co. v. Hernandez*,
  540 U.S. 44 (2003)....................................................................28

*Robertson v. Allegheny Ct. of Com. Pleas*,
  No. 12-1080, 2012 WL 4712034 (W.D. Pa. Aug. 22, 2012)..........32

*Schechtman v. Bonfilio*,
  No. 09-00144, 2009 WL 1175674 (W.D. Pa. Apr. 30, 2009)........18

*Schorr v. Borough of Lemoyne*,
  243 F. Supp. 2d 232 (M.D. Pa. 2003).........................................25

*Sharpvisions, Inc. v. Borough of Plum,*
    475 F. Supp. 2d 514 (W.D. Pa. 2007) .............................................................30

*Tennessee v. Lane,*
    541 U.S. 509 (2004) ........................................................................................26

*Thakker v. Dell,*
    No. 20-00480, 2020 WL 1671563 (E.D. Pa. Mar. 31, 2020) ................. passim

*Thomas v. Tice,*
    948 F.3d 133 (3d Cir. 2020) ............................................................................23

*U.S. v. Bolston,*
    No. 18-00382 (N.D. Ga. Mar. 30, 2020) .........................................................22

*U.S. v. Harris,*
    No. 19-00356, 2020 WL 1503444 (D.D.C. Mar. 26, 2020) ...........................22

*U.S. v. Hector,*
    No. 20-04183 (4th Cir. Mar. 27, 2020) ...........................................................22

*U.S. v. Kennedy,*
    No. 18-20315 (E.D. Mich. Mar. 27, 2020) ......................................................22

*U.S. v. Michaels,*
    No. 16-00076 (C.D. Cal. Mar. 26, 2020) .........................................................22

*U.S. v. Stephens,*
    No. 15-95, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) ...............................35

*Vazquez v. Carver,*
    729 F. Supp. 1063 (E.D. Pa. 1989) .................................................................32

*Wareham v. Pennsylvania Dep't of Corr.,*
    No. 13-0188, 2014 WL 4231280 (W.D. Pa. Aug. 26, 2014) ...........................28

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...........................................................................................18

*Woodall v. Fed. Bureau of Prisons,*
    432 F.3d 235 (3d Cir. 2005) (Becker, J.) ........................................................31

*Xochihua-Jaimes v. Barr,*
    No. 18-cv-71460 (9th Cir. Mar. 23, 2020) ......................................................22

**STATUTES**

8 U.S.C. § 1252 ........................................................................................................ 22

18 U.S.C. § 3626 ..................................................................................................... 32

28 U.S.C. § 1651 ..................................................................................................... 22

28 U.S.C. § 2241 ..............................................................................................2, 3, 31, 32

42 U.S.C. § 1983 ..............................................................................................2, 3, 19, 32

42 U.S.C. § 12101 *et seq* .......................................................................... passim

**OTHER AUTHORITIES**

28 C.F.R. § 35.130(b)(7) ......................................................................................26, 29

U.S. Constitution, Eighth Amendment ........................................................23, 24

U.S. Constitution, Fourteenth Amendment.................................................. passim

## PRELIMINARY STATEMENT

We are living in truly extraordinary times.  Over a million people across the world have been infected by COVID-19, and tens of thousands of them have already died.  The disease has no known cure.  As a result, millions, perhaps billions, of people have been ordered to practice social distancing to avoid spreading the disease.  Jails in urban centers such as those in New York, Chicago, and Philadelphia have become rife with COVID-19; there is no reason to believe that Allegheny County Jail ("ACJ") will prove to be an exception.  Indeed, ACJ has already disclosed that one man currently incarcerated there is infected with COVID-19, and it is highly probable that more will follow.  Unlike the general population in Allegheny County and other communities around the world, Petitioners and the class they seek to represent have been subjected by Defendants to conditions of confinement which prevent them from availing themselves of the basic social distancing and other public health guidelines which are mandated or recommended for everyone else in society.  These conditions of confinement pose a serious and imminent threat of severe disease and death for Petitioners and others in Defendants' custody at ACJ who, because of their age or serious medical conditions, are at heightened risk if they contract COVID-19.  Judicial intervention is absolutely necessary to protect their health and their lives.  Clearly established law requires that they be removed from such conditions immediately, which in this emergency situation requires their release from ACJ.

The conditions of Petitioners' confinement at ACJ are shockingly insufficient to protect them from infection, serious complications, or death from COVID-19:  ACJ is overcrowded; and despite the release of some people, Defendants have chosen to consolidate those remaining instead of spreading them out, thereby subjecting them to double celling and unnecessarily crowded conditions.  The jail's sanitation practices are insufficient; it denies Petitioners and other detainees even the most basic hygiene products; it does not have quarantine procedures for detainees

1

showing symptoms of COVID-19; and it has ignored guidance from the Centers for Disease Control and Prevention ("CDC") directing correctional institutions to implement mitigation efforts like social distancing and other best practices.  At bottom, the conditions at ACJ create an extreme (and avoidable) risk for the rapid, uncontrollable spread of COVID-19 throughout the facility with grave outcomes for both the incarcerated population and the surrounding communities.

Accordingly, Petitioners have brought this action on behalf of a class of similarly situated persons incarcerated at ACJ (the "Proposed Class"), challenging their conditions of confinement and Defendants' actions under 42 U.S.C. § 1983 and 28 U.S.C. § 2241, as well as Defendants' failure to comply with their statutory obligations under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*.  Given their clear likelihood of success on the merits of their claims and the imminent irreparable harm they will suffer without immediate action from this Court, Petitioners seek a preliminary order remedying Defendants' constitutional and statutory violations.  Petitioners' requested relief is in three forms.

*First*, the conditions of confinement that Defendants have forced Petitioners and the Proposed Class to suffer at ACJ violate the Fourteenth Amendment to the United States Constitution.  Specifically, those conditions impose unconstitutional punishment upon all detainees being held pretrial.  Given these constitutional infirmities, Petitioners and the Proposed Class face an immediate and substantial risk that they will be infected, made critically ill, and possibly killed by COVID-19 while in ACJ's care.  What is more, like Petitioners, a substantial number of people currently held at ACJ face serious risks of injury and death due to their age or underlying medical conditions (the "Medically Vulnerable Subclass").  For those persons, immediate release is necessary under 28 U.S.C. § 2241 to protect them from becoming critically ill and dying as a result of Defendants' ongoing constitutional violations.  Petitioners thus seek

writs of habeas corpus to be issued immediately under § 2241 for themselves and the members of the Medically Vulnerable Subclass.

*Second*, these constitutional violations and the attendant intolerable risk to Petitioners and the Proposed Class require immediate relief by this Court to compel Defendants to, at a bare minimum, institute basic mitigation procedures to prevent Petitioners and the Proposed Class from infection and possible death or life-threatening complications from COVID-19.  Petitioners thus seek a preliminary order from this Court pursuant to § 1983 demanding that Defendants modify the conditions of confinement at ACJ to be consistent with CDC guidance, including requiring that Defendants ensure social distancing practices are both possible and mandated at ACJ.

*Third*, Petitioners and other detainees at ACJ suffer from disabilities that put them at an increased risk of infection and death should they be exposed to COVID-19 (the "Disability Subclass"), and ACJ has flouted the ADA by offering them no reasonable accommodations to shield them from this ruthless disease as required by the ADA.  On this basis as well, Petitioners are entitled to preliminary relief from this Court directing Defendants to give them and other members of this Subclass accommodations that will minimize the risk that they will be infected by COVID-19 and subjected to serious illness and possible death.

The stakes here could not be higher.  Lives are at stake.  Courts have acknowledged the gravity of the situation by relying on their equitable powers to protect people held at prisons and detention facilities from COVID-19 during this once-in-a-lifetime pandemic.  Indeed, as described below, given that a large-scale outbreak at ACJ would spill over into the surrounding communities and spread infection throughout the greater-Allegheny County area, Petitioners' requested preliminary relief is more than justified and would impose a minimal burden on Defendants and the public-at-large.

For these reasons and those discussed below, Petitioners move this Court for immediate and preliminary relief directing Defendants to immediately release the most vulnerable detainees at ACJ, remedy its unconstitutional conditions of confinement, and institute reasonable accommodations to protect detainees with disabilities from suffering the unforgiving wrath of COVID-19.

**FACTUAL BACKGROUND**

The Nation and the World are in the grips of the most significant pandemic in generations, caused by COVID-19—a fast-moving virus that has infected and upended life in every corner of the globe, Country, and Commonwealth.  Compl. ¶ 14.  This Court no doubt already is aware of the devastating effects COVID-19 is having on the Commonwealth, generally, and Allegheny County, in particular.  *Id.*  As of April 9, 2020, 1,506,936 cases have been confirmed globally, with 432,596 of those cases in the United States.[1]  Over 14,000 Americans have died.[2]  Allegheny County alone has reported 759 of the Commonwealth's 18,228 cases of COVID-19, and 12 of its 338 deaths.[3]  Reported cases in Allegheny County double every six days.[4]  These numbers likely underestimate the virus's impact, given the lack of testing available and conducted across the Commonwealth and County.  Compl. ¶ 14; *see also* Declaration of Dr. Johnathan Louis Golob ¶ 7 (Apr. 3, 2020) ("Golob Decl."), attached hereto as Exhibit A.[5]  The virus continues to spread

---

[1] *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, Coronavirus Resource Center, Johns Hopkins University & Medicine, (last updated Apr. 9, 2020, 12:00:59pm) https://bit.ly/2JHm53w (last visited Apr. 9, 2020).

[2] *Id.*

[3] Pa. Dep't of Health, *COVID-19 Cases in Pennsylvania* (last updated Apr. 9, 2020 12:00pm), https://bit.ly/2UKL0d2 (last visited Apr. 9, 2020).

[4] *Coronavirus in the U.S.:  Latest Map and Case Count*, NYTimes.com (last updated Apr. 9, 2020, 8:03am), https://nyti.ms/34hDSb4 (last visited Apr. 9, 2020).

[5] Dr. Jonathan Louis Golob is a specialist in infectious diseases and internal medicine, subspecializing in infections in immunocompromised patients, and an Assistant Professor at the University of Michigan School of Medicine.  Golob Decl. ¶ 1.  Dr. Golob obtained his medical

exponentially and out of control. Without effective public health interventions, like those requested by Petitioners in their request for relief, the CDC projects approximately 200 million people in the United States could be infected over the course of the epidemic and as many as 1.5 million Americans could die. Golob Decl. ¶ 11.

## I.  COVID-19 POSES A GRAVE RISK OF SERIOUS INJURY AND DEATH TO THOSE INFECTED, ESPECIALLY INDIVIDUALS LIKE PETITIONERS, WHO ARE MEDICALLY VULNERABLE OR OVER THE AGE OF 55.

COVID-19 is a serious and often fatal respiratory disease caused by a novel coronavirus. Declaration of Joseph J. Amon, Ph.D. MSPH ¶ 5 (Apr. 5, 2020) ("Amon Decl."), attached hereto as Exhibit B.[6] COVID-19 spreads through a population in close contact with each other through respiratory droplets produced when an infected person sneezes, coughs, sings, or even speaks. Amon Decl. ¶¶ 16, 17. These droplets can travel up to six feet through the air to infect another person. *Id.* ¶ 16. The virus also spreads where people touch surfaces and objects contaminated by those same respiratory droplets and then touch their own mouth, nose, or eyes. *Id.* Symptomatic persons spread the disease, but so too can asymptomatic and presymptomatic persons. *Id.* ¶ 17. For this reason, Governor Tom Wolf[7] and the CDC[8] have recommended persons wear masks any time they leave their homes.

---

degree and completed his residency at the University of Washington School of Medicine in Seattle, where he also completed a Fellowship in Internal Medicine Infectious Disease. *Id.* Dr. Golob currently is "actively involved in planning and care for patients with COVID-19." *Id*

[6] Dr. Joseph Amon is a public health expert and epidemiologist who is the Director of the Office of Global Health at Drexel University's Dornsife School of Public Health. Amon Decl. ¶ 1. Dr. Amon previously worked as an epidemiologist at the CDC and has served on advisory committees for the World Health Organization ("WHO"). *Id.* ¶ 2. One of his "main areas of research focus relates to infectious disease control, clinical care, and obligations of government related to individuals in detention settings." *Id.* ¶ 4

[7] *Gov. Wolf Calls for Universal Masking*, Governor Tom Wolf (Apr. 3, 2020), https://bit.ly/34inSWt.

[8] Centers for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19), Recommendation Regarding the Use of Cloth Face Coverings* (Apr. 3, 2020), https://bit.ly/34muHX7.

Symptoms of infection span a range of reactions, from showing no or mild symptoms to respiratory failure and death.  Amon Decl. at ¶ 6.  COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity.  Golob Decl. ¶ 9.  It may also cause inflammation of the heart muscle (known as myocarditis), affecting the heart muscle and electrical system, and reducing the heart's ability to pump blood.  *Id.*  This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits long-term exercise tolerance and even the ability to work.  *Id.*  Emerging evidence also suggests that COVID-19 can trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys (possibly leading to dialysis dependence) and even neurologic injury.  *Id.*  These complications can develop at an alarming pace.  *Id.* at ¶ 6.  Patients can show the first symptoms of infection within two days after exposure, and their condition can seriously deteriorate in five days or sooner.  *Id.*

For persons over the age of 55 or with certain preexisting medical conditions, COVID-19 infection presents an even greater risk of serious symptoms and likely death.  Golob Decl. ¶ 3.  Persons with preexisting lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, and developmental delay are all at a heightened risk of serious illness and death should they become infected with COVID-19.  Amon Decl. ¶ 8; Golob Decl. ¶ 3.  Each Petitioner has one or more of these conditions and thus faces an increased risk of developing serious complications or dying from COVID-19, regardless of his or her age.  Amon Decl. ¶¶ 11–15.

There is no known cure, vaccine, or anti-viral treatment for COVID-19.  Amon Decl. ¶ 6; Golob Decl. ¶ 10.  The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 than from influenza.  Golob Decl. ¶ 4.  According to recent estimates, the fatality rate of people with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.  *Id.*  For people in the highest risk populations, the fatality rate of COVID-19 is about fifteen percent.  *Id.*  High-risk patients who survive should expect prolonged recovery, including the need for extensive rehabilitation for profound reconditioning, loss of digits, neurological damage, and loss of respiratory capacity.  *Id.*

The most effective strategy for limiting the spread of the disease is social distancing—deliberately keeping at least six feet of space between persons to avoid spreading the illness—combined with a vigilant hygiene regimen, including washing hands frequently and thoroughly with soap and water, and disinfecting surfaces.  Amon Decl. ¶ 18.  Following the recommendation of public health experts, government officials across the country have taken extraordinary measures to implement social distancing to minimize the spread of the disease, including shutting down schools, non-essential businesses, all sports activities, and courts.  *Id.* ¶ 19.  The goal of these efforts is to "flatten the curve" by spreading the rate of infection across a longer period of time to avoid overwhelming the healthcare facilities that need to treat the most serious cases of COVID-19 infection.  *Id.* ¶ 20.

II.   **THE CONDITIONS AT JAILS AND DETENTION FACILITIES LIKE ACJ PLACE ALL PERSONS DETAINED THERE AT AN EVEN GREATER AND IMMEDIATE RISK OF COVID-19 INFECTION THAN MEMBERS OF THE PUBLIC-AT-LARGE.**

Allegheny County has not been spared from COVID-19.  As discussed above, Allegheny County has reported over 750 cases of COVID-19 and 12 deaths,[9] with reported cases doubling every six days.[10]  Recent data show that in the most likely infection scenarios, Pittsburgh-area hospitals will face a critical bed shortage in a matter of weeks.[11]  The first positive test of an incarcerated person at ACJ for COVID-19 was announced the day after the Complaint was filed in this case.[12]  Without adequate testing, it is impossible even to know how many in ACJ are already infected; it is likely that COVID-19 cases will grow rapidly inside the ACJ.  At least one Petitioner, Heather Connolly, has exhibited symptoms consistent with COVID-19, yet she has not been tested, quarantined, or received any medical treatment.  Declaration of Heather Connolly ¶¶ 5, 7–9, 13, 15 (Apr. 2, 2020) ("Connolly Decl."), attached hereto as Exhibit C.

Given the way COVID-19 spreads throughout a population, it is undeniable that ACJ's detainee population faces a severe threat of infection.  A detention facility like ACJ is the exact type of congregated environment—where people live, eat, bathe, and sleep in close proximity—where COVID-19 infection thrives.  Amon Decl. ¶ 23; Golob Decl. ¶ 13.  Particularly vulnerable people in such settings, especially those high-risk individuals over the age of 55 and suffering from

---

[9] Pa. Dep't of Health, *COVID-19 Cases in Pennsylvania* (last updated Apr. 9, 2020, 12:00pm), https://bit.ly/2UKL0d2 (last visited Apr. 9, 2020).

[10] *Coronavirus in the U.S.: Latest Map and Case Count*, NYTimes.com (last updated Apr. 9, 2020, 8:03am), https://nyti.ms/34hDSb4 (last visited Apr. 9, 2020).

[11] Eric Heyl, *Coronavirus: Pittsburgh Hospitals Expected to Have Bed Shortages*, Patch.com (Mar. 18, 2020), *available at* https://bit.ly/2UY2JfU.

[12] *Inmate at Allegheny County Jail tests positive for COVID-19*, Pittsburgh Post Gazette (April 8, 2020), https://bit.ly/3aX3qNd.

certain preexisting medical conditions, face a far greater risk of infection, severe illness, and death than those free to isolate in their homes or avoid groups of people. Amon Decl. ¶¶ 22–30, 42–46.

This increased risk is present in every jail, given those facilities' very natures. *Id.* ¶ 23. People incarcerated in these facilities live in cramped conditions and are forced into close contact with each other and prison staff, including corrections officers. *Id.* They may be unable to maintain the recommended distance of six feet from others at all times and thereby cannot achieve the requisite social distancing needed to effectively prevent the spread of COVID-19. *Id.* They likely share or touch objects used often by others and cleaned infrequently. *Id.* at ¶¶ 23, 27. In addition to eating, sleeping, recreating, and living close to each other, they have to share bathroom facilities—showers, toilets, and sinks—without adequate cleaning between uses. *Id.* ¶ 23. Food is prepared, served, and consumed communally and without proper precautions or disinfection. *Id.* Additionally, many detainees, including all of Petitioners, suffer from chronic, often untreated illnesses. *See id.* ¶¶ 11–15. These people thus remain virtually helpless to mitigate against the very preexisting conditions that place them at a higher risk should they become infected by COVID-19, given that ACJ (like most jails) lacks the medical care to treat sick detainees. *Id.* ¶¶ 23, 26. Insufficient medical treatment capabilities also make it nearly impossible to treat infected detainees, let alone prevent the further spread of COVID-19 throughout the jail population. *Id.* ¶¶ 23, 26.

Public health experts across the Country, including within the federal government, agree that jails and detention centers like ACJ present a tinderbox scenario though which COVID-19 infections could burn before spilling over into the surrounding communities. In response, the CDC has issued guidance for correctional facilities, which specifically recommends, among other things, that jails like ACJ implement social distancing to increase space between incarcerated

people to six feet.  Amon Decl. ¶ 24.[13]  But jails have proven to be incapable of implementing CDC recommendations, and incarcerated people are already dying nationwide as a result.  *Id.* ¶¶ 31, 33. The dramatic outbreaks in the Cook County Jail and Rikers Island in New York City make this perfectly clear, where the transmission rate for COVID-19 is estimated to be the highest in the world.  Golob Decl. ¶ 12.  For instance, in Rikers Island, 21 inmates and 17 employees tested positive for COVID-19 on March 21.  Amon Decl. ¶ 31.  By March 26, the number grew to 75 inmates and 37 employees.  *Id.*  And by March 31, 141 staff and 180 inmates had tested positive. *Id.*  Overall, the current infection rate of COVID-19 in New York jails is seven times the rate of infection in New York City generally and 87 times higher than in the entire United States.  *Id.*  The death toll is rising, as six correctional officers and a captain have died in the last three weeks in New York City, all but one of them employed at Rikers Island.[14]  Meanwhile, Cook County Jail in Chicago has become the largest known source of COVID-19 infections in the Nation.[15]  In just over two weeks, the number of confirmed cases ballooned from 2 to 238 detainees and 115 staff, with the first confirmed death from COVID-19 on April 5, 2020.[16]

III. **THE CURRENT CONDITIONS IN WHICH DEFENDANTS HAVE CONFINED PETITIONERS AND CLASS MEMBERS IN ACJ ONLY EXACERBATE THE ALREADY EXTREME AND IMMINENT DANGER THEY FACE OF CONTRACTING AND POSSIBLY DYING FROM COVID-19**.

Declarations from Petitioners, their experts, and others incarcerated at ACJ document the multiple ways Defendants continue to defy CDC recommendations at ACJ by continuing to force

---

[13] *See also* Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020) *available at* https://bit.ly/2UKYGES.
[14] Chelsia Rose Marcius, *Coronavirus claims the lives of at least 6 NYC correction officers, 1 captain,* New York Daily News (April 7, 2020, 2:45 p.m.), https://bit.ly/2VdaAGF.
[15] Timothy Williams and Danielle Ivory, *Chicago's Jail is Top U.S. Hot Spot as Virus Spreads Behind Bars*, New York Times (April 8, 2020, 7:40 p.m.), https://nyti.ms/2x7LYHr.
[16] *Id.*; *Cook County Jail reports first detainee death from coronavirus*, CNN (April 8, 2020 7:45 p.m.), https://cnn.it/3b88NcN.

Petitioners and other detainees to sleep, eat, recreate, and use the phone in close proximity—among other things—with no social distancing or other efforts to minimize the spread of COVID-19. *See* Amon Decl. ¶ 27 (explaining ACJ has failed to implement the basic procedures to minimize the spread of COVID-19). Defendants thus have created conditions of confinement at ACJ that fall hopelessly short of expert recommendations and increase the risk that Petitioners and the class members will contract COVID-19, which creates an imminent and immediate threat to their health and lives, especially for members of the Medically Vulnerable[17] and Disability[18] Subclasses.

### A.   Defendants Have Refused To Take The Most Basic Precautions, Like Social Distancing, To Limit The Spread Of COVID-19 In The ACJ.

In recognition of the threat that COVID-19 poses to the jail, approximately 600 detainees have been released from ACJ in the past few weeks.[19] But Defendants have not leveraged the resulting additional capacity to implement recommended and necessary social distancing measures. Rather than spread people out across the facility and ensure each person gets his or her own cell, paradoxically, Defendants have done just the opposite by consolidating the prison's operations into discrete parts of the jail, ignoring the substantial number of empty cells on the pods, and placing two detainees in each cell. *See* Declaration of Alexus Diggs ¶¶ 4, 15 (Apr. 5, 2020) ("Diggs Decl."), attached hereto as Exhibit D; Connolly Decl. ¶¶ 5, 14, 17; Declaration of Larnell Jones ¶ 9 (Apr. 3, 2020) ("Jones Decl."), attached hereto as Exhibit E; Declaration of Michael

---

[17] The Complaint defines the "Medically Vulnerable" subclass as "all current and future persons held at ACJ who are 55 and older, as well as all current future persons held at ACJ of any age" who have been diagnosed with certain preexisting conditions making them more susceptible to critical illness and death should they become infected with COVID-19. *See* Compl. ¶ 77.

[18] The Complaint defines the "Disability" subclass as "all current and future persons held at ACJ who have a physical impairment that substantially limits one or more of their major life activities and who are at increased risk of COVID-19 illness, injury, or death due to their disability or any medical treatment necessary to treat their disability," and providing examples. *See* Compl. ¶ 78.

[19] Jacob Tierney, *More than 600 Inmates Released from Allegheny County Jail in Pittsburgh to Slow Pandemic*, TribeLive (March 31, 2020 6:36pm), https://bit.ly/2Vih3jk.

Graham ¶¶ 16–17 (Apr. 4, 2020) ("Graham Decl."), attached hereto as Exhibit F; Declaration of Terry Suggs ¶¶ 8, 10 (Apr. 3, 2020) ("Suggs Decl."), attached hereto as Exhibit G; Declaration of Shaquille Howard ¶¶ 7-8 (Apr. 8, 2020) ("Howard Decl."), attached hereto as Exhibit H.

The risks of double-celling people during a global pandemic are apparent and defy logic. ACJ's cells are too small for two people to stand inside and remain six feet away from each other, as the CDC has urged—if not ordered—hundreds of millions of Americans to do.  There simply is no way for someone to practice social distancing while confined to a cell with another person. The detainees sleep in bunk beds and share a desk, a toilet, and a sink in each cell.  Connolly Decl. ¶ 6; Suggs Decl. ¶ 9.  Further, cellmates may change frequently.  *See e.g.,* Connolly Decl. ¶¶ 11–12, 14; Jones Decl. ¶¶ 8, 10; Suggs Decl. ¶ 8.  Adding insult to injury, it makes no sense for ACJ to be instituting such demonstrably unsafe practices with plenty of empty cells all over the jail.

Defendants do not allow ACJ detainees any opportunity to practice social distancing even outside of their cells.  Multiple times a day, between 40 and 100 detainees receive their meals together and take them to tables in the dayroom.  This is far more than the 10-person limit the CDC and many jurisdictions recommend for any congregation of persons.[20]  The tables at which detainees must eat their meals are four-feet-by-four-feet squares and sit four people, with one person on each side; there simply is no opportunity for practicing social distance during meals. Suggs Decl. ¶¶ 11, 13; Jones Decl. ¶¶ 11, 13; Graham Decl. ¶¶ 14–15; Amon Decl. ¶ 26

Defendants also have ignored any efforts to implement social distancing during recreation at the ACJ.  The recreation area remains crowded, with approximately 40 to 50 people freely

---

[20] *See* Centers for Disease Control and Prevention, *Resources for Large Community Events & Mass Gatherings, Before and During an Outbreak* (Mar. 21, 2020), https://bit.ly/2yJxaPz (recommending for communities with "minimal or moderate spread" that "organizations that serve people who are at higher risk of serious COVID-19 illness, cancel events for groups of 10 people or more").

released at the same time during recreation—many playing basketball, exercising, and engaging in other group recreational activities—all unable to maintain the six-foot distance recommended for social distancing.  Suggs Decl. ¶¶ 11–12; Jones Decl. ¶¶ 11–12; Graham Decl. ¶ 15.

It is the same story with the communal phones.  Because ACJ prohibits visitors, telephone calls are the only lifeline to their friends and family for many of the detainees.  As a result, the telephone bays frequently are crowded, where detainees jam shoulder-to-shoulder next to each other.  Suggs Decl. ¶ 16; Jones Decl. ¶¶ 16–17; Graham Decl. ¶ 15.  And Defendants do not disinfect or sanitize the phones in between the calls.  Suggs Decl. ¶ 16; Jones Decl. ¶ 18; Graham Decl. ¶ 15.

### B.    Defendants Maintain Dangerous, Unsanitary Conditions At ACJ And Do Not Provide Appropriate Medical Care.

Defendants also do not conduct sanitary procedures sufficient to promote proper personal hygiene or ensure that common areas shared by many detainees remain clean.  For example, Defendants do not sanitize or clean the unit showers between uses, despite their being shared by multiple individuals.  Connolly Decl. ¶ 20; Suggs Decl. ¶ 17; Jones Decl. ¶ 19; Graham Decl. ¶ 17; Diggs Decl. ¶ 18.  And Defendants regularly deny detainees cleaning materials necessary to engage in personal hygiene or to clean their cells or common areas.   Although regular, frequent handwashing is vital for limiting the spread of COVID-19 from one person to another, Defendants permit detainees access to only one bar of soap per week.  Graham Decl. ¶ 16; Suggs Decl. ¶ 20.  Unsurprisingly, detainees often run out of soap completely.  *See* Graham Decl. ¶ 16 (explaining he has been without a bar of soap since April 1st).  Defendants have not increased cleaning the prison generally; the common areas are cleaned depending on whatever staff member is on duty, whereas the cells simply are not cleaned regularly.  Connolly Decl. ¶ 21; Diggs Decl. ¶¶ 18, 19; Graham Decl. ¶ 19.  Shockingly, at a time when detainees are in need of cleaning supplies more

than ever before, Defendants refuse to make these supplies available so that detainees can sanitize their own cells.  Diggs Decl. ¶ 17; Connolly Decl. ¶ 19; Jones Decl. ¶ 20; Graham Decl. ¶19; Suggs Decl. ¶ 18.  Rather, Defendants have let ACJ fester.  As an example, Plaintiff Connolly, while in her cell with possible COVID-19 symptoms, experienced waste water leaking into her cell from the cell above.  Connolly Decl. ¶ 10.  She had to use her clothes and other personal belongings to clean up the waste water from her cell.  *Id.*

Perhaps Defendants' most concerning failure is the utter lack of medical staffing at ACJ.  As of February 26, 2020, the jail had 48 health care vacancies out of an expected health care staff of approximately 136 full and part-time positions.  That means around one-third of all health care positions at the jail are vacant, though the situation may be even worse due to the substantial number of leadership and full-time positions that are vacant.  *See* ACJ Employees List & ACJ Health Vacancies, attached hereto as Exhibit I.  As is common in prisons and jails throughout the Country, the provision of medical care at ACJ suffers from serious inadequacies under normal circumstances.  In this time of crisis, the staff and resources at ACJ will undoubtedly be overwhelmed, and subsequent overflow will flood local hospitals, already expected to be taxed in the upcoming weeks.  Medical staff at ACJ are already failing to provide adequate care or even temperature checks to individuals experiencing COVID-19 symptoms.  Connolly Decl. ¶¶ 4–9, 11; Jones Decl. ¶¶ 23–25; Suggs Decl. ¶¶ 23–24; Howard Decl. ¶¶ 10–13.

### C. Defendants Do Not Properly Intake, Test, And Quarantine Persons Suspected Of COVID-19 Infection.

Defendants' intake process at ACJ similarly is woefully inadequate.  Amon Decl. ¶¶ 29–30.  For instance, a newly admitted 57-year-old cellmate of Mr. Suggs spent a mere four days in intake before he was placed in a general housing cell with a medically vulnerable cellmate.  Suggs Decl. ¶ 8.

Even more troubling, ACJ currently does not test its employees or staff for COVID-19, despite the very real possibility that one (or more) is a carrier who will bring the virus into the facility. *See* Letter to Orlando L. Harper, *Warden, Re: Continuing of Operations Plan: COVID-19 (Updated)* at 3–4 (Mar. 30, 2020) ("ACJ COVID-19 Policies") (describing employee screening involving temperature taking and questions, and noting that employees with fevers high enough to prevent them working can arrange for "[t]esting . . . through the Allegheny County Health Department"), attached hereto as Exhibit J.  This failure is alarming.  Data from other jurisdictions show that the rates of infection among correctional officers, generally, are high.  Amon Decl.  ¶¶ 31–33.  There is no reason to suspect this is not the case at ACJ, especially where recent reporting suggests the opposite.[21]

Moreover, as Dr. Amon has recognized, Defendants have made no efforts "to identify and properly isolate individuals at high risk, those with potential exposure," or "those with symptoms consistent with COVID-19."  *Id.* ¶ 28.  ACJ does not even have sufficient tests to identify disease carriers or sufficient physical and medical infrastructure.  *Id.* ¶ 34.  If a person at AJC presents with COVID-19 symptoms, Defendants allow that person to remain in their cell, with a cellmate, and fail to offer them frequent visits or temperature checks from the medical staff.  *See* Connolly Decl. ¶¶ 4–9.  Plaintiff Connolly is a cautionary, but likely not unique, example in this regard. After feeling feverish for over a week and later expressing symptoms consistent with COVID-19 (nausea, shortness of breath, among others), the only medical care given was one temperature check, which merely confirmed her fever.  *See* Connolly Decl. ¶¶ 5–9, 15.  Defendants never took her to the infirmary nor did they test her, isolate her, or even clean her cell.  *Id.* ¶¶ 9, 13.  Shortly

---

[21] Ryan Deto, *An Employee at the Allegheny County Jail Has Tested Positive for COVID-19*, Pittsburgh City Paper (Mar. 27, 2020), https://bit.ly/2V1HhGV.

thereafter, her cellmate developed a high fever and extreme shortness of breath, but remained in the cell with Ms. Connolly for multiple days before being transferred to the infirmary. *Id.* ¶¶ 11–12. Another detainee, Terry Suggs, also suffered from a fever but was not isolated, tested, or provided any medical care other than a temperature check. Suggs Decl. ¶ 24. And although ACJ is supposed to give masks to persons likely infected with COVID-19, *see* ACJ COVID-19 Policies at 11, masks and other personal protective equipment ("PPE") are not readily available throughout the facility, Suggs Decl. ¶¶ 19, 24.

> **D.     Petitioners And Other Members Of The Medically Vulnerable Subclass Must Be Released From Custody Immediately, Given Their Heightened Risk Of Becoming Critically Ill Or Dying If Infected By COVID-19.**

Given the current conditions at ACJ, Petitioners and the other members of the Medically Vulnerable Subclass must be immediately released. As recognized by Dr. Amon, "the release of individuals who can be considered at high-risk of severe disease if infected with COVID-19"— *i.e.*, Petitioners and other members of the Medically Vulnerable Subclass—is "a key part of a risk mitigation strategy." Amon Decl. ¶ 43. After release, those high-risk individuals can self-isolate and further protect themselves from infection. *Id.* ¶¶ 43, 46. In fact, Dr. Amon advocates that prisons like ACJ generally release people, regardless if they are particularly high-risk, given that doing so would reduce the number of individuals in the facility and promote social distancing practices for those that remain. *Id.* ¶ 45. In the event that vulnerable detainees have been exposed to COVID-19 while in prison, Dr. Amon recommends testing where possible and releasing such detainees to a quarantine setting other than the prison facility in coordination with local health authorities. *Id.* ¶ 44.

This is true for all members of the Medically Vulnerable Subclass, given the age and preexisting medical conditions of those persons, which render them at an increased risk of becoming seriously ill and dying if infected with COVID-19. *See supra* at pp. 5–7. Additionally,

as described above, all Petitioners have underlying medical conditions or are of an age that increases their risk of serious illness or death if exposed to COVID-19:

- Petitioner Michael Graham is a 38-year-old man who is being held at ACJ on a probation detainer and a misdemeanor charge who is unable to make bail of $5,000. Graham Decl. ¶¶ 1, 3–4. He has been diagnosed with asthma and hepatitis C, conditions that have substantially limited his respiratory and digestive systems, making him a qualified individual with a disability under the ADA. *Id.* ¶ 2. His underlying health conditions place him at high risk of severe illness or death if he contracts COVID-19. *Id.*

- Petitioner Alexus Diggs is a 24-year-old woman who is being held at ACJ on a probation detainer and a misdemeanor charge and bail of $100. Diggs Decl. ¶¶ 1–3. She has been diagnosed with hypertension, a condition that has substantially limited her circulatory system, making her a qualified individual with a disability under the ADA. Her underlying health conditions place her at increased risk of severe illness or possible death if she contracts COVID-19. *Id.* ¶ 1. On April 1, she started noticing scratchiness in her throat, and the next day started sneezing and having a runny nose. She has never been tested and has no way to know if she has COVID-19 or a simple cold. *Id.* ¶¶ 5–6. She is in a double cell and has remained there despite these symptoms. *Id.* ¶ 4. She fears for her health and life if she remains at ACJ. *Id.* ¶ 21.

- Plaintiff Heather Connolly is a 48-year-old woman who is being held at ACJ on a probation detainer and a misdemeanor charge and is unable to make bail of $10,000. Connolly Decl. ¶¶ 1–3. She has been diagnosed with hepatitis C, a viral infection of the liver that has substantially limited her digestive system, making her a qualified individual with a disability under the ADA. *Id.* ¶ 1. She is in a double cell, despite showing possible symptoms of COVID-19. *Id.* ¶ 14. Her underlying health conditions place her at increased risk of severe illness or possible death if she contracts COVID-19. *Id.* ¶ 1. She fears for her health and life if she remains at ACJ. *Id.* ¶ 23.[22]

Accordingly, given the extreme risks Petitioners and members of the Medically Vulnerable Subclass face should they be required to remain at ACJ, they should be ordered released immediately. That is the only way to protect them from becoming critically ill and likely dying.

## LEGAL STANDARD

On a motion for a preliminary injunction, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

---

[22] For these reasons, too, all Petitioners have conditions that qualify them as individuals with disabilities under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*

17

relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (same).   A motion for a preliminary injunction requires the Court to "engage in a delicate balancing of all the elements, and attempt to minimize the probable harm to legally protected interests." *Schechtman v. Bonfilio*, No. 09-00144, 2009 WL 1175674, at *1 (W.D. Pa. Apr. 30, 2009) (citing *Constructors Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978)).   Courts have broad power to fashion equitable remedies to address constitutional violations in prisons, *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978), including, "[w]hen necessary to ensure compliance with a constitutional mandate," orders "placing limits on a prison's population," *Brown v. Plata*, 563 U.S. 493, 511 (2011).   Courts "must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners" and "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Id.* at 511 (citations and quotation marks omitted)).

## ARGUMENT

**I.   PETITIONERS AND MEMBERS OF THE PROPOSED CLASS ARE ENTITLED TO EQUITABLE RELIEF TO PREVENT THEM FROM INFECTION, DEATH, OR SERIOUS COMPLICATIONS FROM COVID-19.**

### A.   Petitioners' Likelihood Of Success On The Merits Warrants Immediate Injunctive Relief.

Petitioners and the other pretrial detainees in the Proposed Class are likely to prevail on the claim that the conditions of confinement at ACJ and Defendants' deliberate indifference to their health and safety in the face of the current pandemic violate their Fourteenth Amendment due process rights.   These constitutional violations entitle (1) Petitioners and the Medically Vulnerable Subclass to immediate release under § 2241, and (2) Petitioners and all pretrial detainees as part of the Proposed Class to injunctive relief under § 1983.   Additionally, Petitioners and the Disability

18

Subclass are likely to prevail on the claim that Defendants are discriminating against them on the basis of a disability in violation of the Americans with Disabilities Act ("ADA").  This unlawful, discriminatory conduct also entitles Petitioners and the Disability Subclass to injunctive relief.

Record evidence—in the form of sworn declarations from residents in Defendants' custody, expert opinions from an epidemiologist and a physician with particular specialties in infectious diseases, and state and federal guidance—amply demonstrate the breadth and scope of Defendants' unconstitutional and unlawful actions and inactions.  Petitioners and the Medically Vulnerable Subclass are at a heightened risk of critical illness or death.  This situation is tragic, unconstitutional, and unlawful, and the Court must act now to protect these individuals.

     1.     **Petitioners and Proposed Class Members Are Likely to Succeed on the Merits of their § 2241 and § 1983 Claims.**

       a.     **The Conditions of Confinement at ACJ Violate the Fourteenth Amendment and Constitute Unconstitutional Punishment.**

As pretrial detainees who have not been convicted of a crime, the Fourteenth Amendment protects Petitioners and pretrial detainees in the Proposed Class from any form of punishment.  *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished."); *Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005) (*Hubbard I*) (same).  When deciding whether challenged conditions of confinement amount to punishment, courts ask "whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, [courts] may infer 'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees.'"  *E.D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019) (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008) (*Hubbard II*)); *see also Thakker v. Dell*, No. 20-00480, 2020 WL 1671563, at *7 (E.D. Pa. Mar. 31, 2020) (citing *Hubbard II*, 538 F.3d at 232) (similar).

Here, the conditions of confinement imposed on Petitioners and other pretrial detainees at ACJ amount to unconstitutional punishment in violation of the Fourteenth Amendment's due process clause, given that those conditions place them at significant increased risk of COVID-19 and are unreasonably related to any legitimate government objective.   As discussed above, detention facilities like ACJ place detainees at an even greater and immediate risk of contracting COVID-19 than members of the public-at-large.  *See supra* pp. 8–10.  Yet, the current conditions of confinement fail to protect Petitioners and pretrial detainees from the increased risk of COVID-19.  Defendants have not implemented social distancing practices at ACJ.  *See supra* § pp. 10–13.  Defendants maintain dangerous, unsanitary conditions at ACJ.  *See supra* § pp. 13–14.  And most disturbingly, Defendants do not test, quarantine, or provide the medical care necessary to protect detainees from the threat of COVID-19.  *Id*.

As was the case in *Thakker v. Doll*, a recent decision from the Middle District of Pennsylvania that ordered the immediate release of civil detainees, the conditions of confinement at ACJ have "no rational relationship between a legitimate government objective" and keeping Petitioners and pretrial detainees in the Proposed Class "detained in unsanitary, tightly-packed environments."  2020 WL 1671563, at *8.  Rather, doing so clearly constitutes unconstitutional punishment that violates the rights of all pretrial detainees in the Proposed Class and their Fourteenth Amendment due process rights.  *See id.* at *7–8 (citing *Hubbard II*, 538 F.3d at 232).  *Thakker* comports with recent decisions from courts around the Country holding that detainees suffer unconstitutional punishment when held in conditions that increase their exposure to COVID-19.  For example:

- Order at 17, *Hernandez v. Wolf*, No. 20-00617, Dkt. No. 17 (C.D. Cal. Apr. 1, 2020) ("Hernandez has not been protected.  He is not kept at least 6 feet apart from others at all times.  He has been put into a situation where he has been forced to touch surfaces touched by other detainees, such as with common

sinks, toilets and showers.  Moreover, the Government cannot deny the fact that the risk of infection in immigration detention facilities – and jails – is particularly high if an asymptomatic guard, or other employee, enters a facility. While social visits have been discontinued at Adelanto, the rotation of guards and other staff continues."), attached hereto as Exhibit K.

- *Castillo v. Barr*, No. 20-00605, 2020 WL 1502864, at *5–6 (C.D. Cal. Mar. 27, 2020) ("Civil detainees must be protected by the Government.  Petitioners have not been protected.")

- *Basank v. Thomas*, No. 20-02518, 2020 WL 1481503, at *1, 5 (S.D.N.Y. Mar. 26, 2020) ("Each Petitioner suffers from chronic medical conditions, and faces an imminent risk of death or serious injury in immigration detention if exposed to COVID-19. . . . . Respondents represented that ICE and the detention facilities in which Petitioners are housed are taking certain measures to prevent the spread of virus:  screening detainees upon intake for risk factors, isolating detainees who report symptoms, conducting video court appearances with only one detainee in the room at a time, providing soap and hand sanitizer to inmates, and increasing the frequency and intensity of cleaning jail facilities.  These measures are patently insufficient to protect Petitioners." (paragraph break omitted)).

Even more, these decisions comport with a growing trend of decisions that recognize relief is necessary to protect pretrial detainees from the risks associated with COVID-19, including the following examples:

- Order, *U.S. v. Hector*, No. 20-04183 (4th Cir. Mar. 27, 2020) (reversing denial of release pending appeal and ordering the district court to "consider the severity of the risk that the COVID-19 virus poses to appellant given her existing medical conditions"), *on remand*, Order, No. 18-002, Dkt. 748 (W.D. Va. Mar. 27, 2020) (granting release pending sentencing), attached hereto as Exhibit L.

- Order, *Xochihua-Jaimes v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (ordering *sua sponte* the release of a civil detainee under 8 U.S.C. § 1252(b)(3)(B) and 28 U.S.C. § 1651(a)) ("In light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers, the court *sua sponte* orders that Petitioner be immediately released from detention and that removal of Petitioner be stayed pending final disposition by this court."), attached hereto as Exhibit M.

- Order, *U.S. v. Bolston*, No. 18-00382, Dkt. No. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued

incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19 outbreak"), attached hereto as Exhibit N.

- Order, *U.S. v. Kennedy*, No. 18-20315, Dkt. No. 77 (E.D. Mich. Mar. 27, 2020) (releasing defendant in light of the threat that COVID-19 poses to prisoners), attached hereto as Exhibit O.

- Order, *U.S. v. Michaels*, No. 16-00076, Dkt. No. 1061 (C.D. Cal. Mar. 26, 2020) (granting temporary release because "Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'"), attached hereto as Exhibit P.

- Order, *U.S. v. Harris*, No. 19-00356, Dkt. No. 36, 2020 WL 1503444 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."), attached hereto as Exhibit Q.

Simply put, there is "no rational relationship between a legitimate government objective and keeping [Petitioners and other pretrial inmates] detained in unsanitary, tightly-packed environments—doing so would constitute a punishment to Petitioners." *Thakker*, 2020 WL 1671563, at *8.

> **b.** **Defendants Are Deliberately Indifferent to the Health and Safety of Petitioners and Other Pretrial Inmates in Violation of the Fourteenth Amendment.**

Pretrial detainees, like Petitioners, who are in the Proposed Class are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Aruanno v. Johnson*, 683 F. App'x 172, 175 (3d Cir. 2017) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982)).  As a result, conditions that violate the Eighth Amendment necessarily also violate a pretrial detainee's due process rights under the Fourteenth Amendment.  *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003) (explaining "Fourteenth Amendment affords pretrial detainees protections 'at least as great as the Eighth Amendment protections available to a convicted prisoner'" (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983))).

22

To prevail on an Eighth Amendment conditions of confinement claim, a plaintiff must meet two requirements: (1) the deprivation alleged must objectively be "sufficiently serious," and (2) the "prison official must have a sufficiently culpable state of mind," such as deliberate indifference to the prisoner's health or safety. *See Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

Leaving those in custody in the path of infectious disease easily satisfies the first prong. The Supreme Court held in *Helling v. McKinney* that the government violates the Eighth Amendment when it crowds prisoners into cells with others who have "infectious maladies" or otherwise exposes prisoners "to a serious, communicable disease." 509 U.S. 25, 33 (1993) (citing *Hutto v. Finney,* 437 U.S. 678, 682 (1978)). This is true "even though the possible infection might not affect all of those exposed." *Id*.

Petitioners also satisfy the second prong because Defendants are undeniably aware of the serious risk that COVID-19 poses to Petitioners and other pretrial inmates. Defendants dedicated a page on the ACJ's website to the threat that COVID-19 poses to the detainees, and specifically admitted that "[c]onfined areas present challenges when it comes to mitigation and elimination of the spread of illness or disease, and COVID-19 is no exception."[23] They are also undoubtedly aware of the efforts by the Court of Common Pleas and county officials to release over 600 people in direct response to the disease. *See supra* at p. 11. Defendants then rejected this opportunity at improving conditions and instead made ACJ even more dangerous for the remaining detainees. Despite the clear nature of the risk, Defendants have not remedied the dangerous conditions for those who remain at ACJ.

---

[23] Allegheny County, *Allegheny County Jail, COVID-19 Alert: Our Response*, https://bit.ly/2wkEEYl (last visited Apr. 9, 2020).

Despite this actual knowledge, Defendants continue to disregard the excessive risk ACJ's conditions of confinement place on the health and safety of Petitioners and other pretrial detainees in the Proposed Class.  Specifically, Petitioners' expert, Dr. Amon, recognized that ACJ has not adopted the procedures needed to prevent the spread of COVID-19.  Amon Decl. ¶ 27.  In particular, Dr. Amon criticized ACJ's practices of keeping multiple individuals "for extended periods of time in the intake area, typically with 10 or more people sharing a single toilet or sink" with "[o]nly cursory medical screening"; double-celling "[a] significant number of people"; limiting "[a]ccess to soap," and "access to personal hygiene and cleaning supplies"; forcing "many people" to share "the same shower area, without any sanitation between individual uses"; using "small" dining tables for meals, which prevent appropriate social distancing during meal times; and providing "inadequate" "[a]ccess to medical care."  *Id.* ¶ 26.  More broadly, Dr. Amon recognized that ACJ takes no steps "to identify and properly isolate individuals at high risk, those with potential exposure" or "those with symptoms consistent with COVID-19."  *Id.* ¶ 28.  Indeed, facilities like ACJ lack basics such as sufficient tests to identify disease carriers or sufficient physical and medical infrastructure.  *Id.* ¶ 34.

The evidence establishes that COVID-19 poses a serious risk of which Defendants are unquestionably aware.  Their failure to undertake measures to protect detainees against the risk of COVID-19 is deliberate indifference to that risk, in violation of the constitutional rights of Petitioners and other pretrial detainees in the Proposed Class.

      **2.**      **Petitioners and the Disability Subclass are Likely to Succeed on the Merits of Establishing an Americans with Disabilities Act Violation.**

The Americans with Disabilities Act ("ADA") is "a remedial statute, designed to eliminate discrimination against the disabled in all facets of society" and "must be broadly construed to effectuate its purposes."  *Schorr v. Borough of Lemoyne*, 243 F. Supp. 2d 232, 235 (M.D. Pa. 2003)

(citing *Tcherepnin v. Knight*, 289 U.S. 332, 335 (1967)).  To establish a claim for relief under Title II of the ADA, 42 U.S.C. § 12101 *et seq*., a plaintiff must establish "that he is a qualified individual with a disability, who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by reason of his disability."  *Chmiel v. Pennsylvania Dep't of Corr.*, No. 18-1691, 2020 WL 1332830, at *8 (W.D. Pa. Mar. 23, 2020) (quoting *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 289 (3d Cir. 2019)); *see also Bowers v. NCAA*, 475 F.3d 524, 553 n.32 (3d Cir. 2007.  The ADA prohibits public entities, including county jails, from discriminating on the basis of disability.  *See, e.g.*, *Pa. Dep't of Corr. v. Yeskey,* 524 U.S. 206, 209–10 (1998) (finding ADA protections apply to activities of correctional institutions); *Chisolm v. McManimon*, 275 F.3d 315, 325 (3d Cir. 2001) ("Title II of the ADA applies to services, programs and activities provided within correctional institutions.").  Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity."  42 U.S.C. § 12132.  Discrimination includes failing to make reasonable accommodations that would allow a person with a disability to participate in a service, program or activity.  28 C.F.R. § 35.130(b)(7); *Tennessee v. Lane*, 541 U.S. 509, 531 (2004) (noting Congress recognized "that failure to accommodate persons with disabilities will also have the same practical effect as outright exclusion" or discrimination).

Members of the Disability Subclass are likely to succeed on the merits of their claim that they are disabled and that Defendant Allegheny County has discriminated against them by failing to provide reasonable accommodations—in this case, heightened protections to safeguard against coronavirus exposure and COVID-19.

*First*, members of the Disability Subclass are qualified individuals with disabilities.  The ADA defines disability as an impairment that substantially limits "major life activities."  42 U.S.C. § 12102(2).  "Major life activities" include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."  *Id.*  Each Petitioner has a physical impairment that constitutes a disability under the ADA, Amon Decl. ¶¶ 11-12, 15, and the same is true (by definition) of each member of the Disability Subclass, which is defined as all current and future persons held at ACJ who have a physical impairment that substantially limits one or more of their major life activities and who are at increased risk of COVID-19 illness, injury, or death due to their disability or any medical treatment necessary to treat their disability.[24]

*Second*, members of the Disability Subclass are precluded from safely participating in ACJ's services, programs, and activities.  "Services, programs, and activities" under the ADA "encompass virtually everything that a public entity does."  *Haberle v. Troxell*, 885 F.3d 171, 180 (3d Cir. 2018) (internal quotations omitted); *see also Furgess*, 933 F.3d at 289 ("We have confirmed these terms' broad meaning, calling them 'all-encompassing.'").  Due to the unique nature of detention, in which facility staff control nearly all aspects of detained individuals' daily lives, this includes "virtually all [] prison programs," including those involving "mobility, hygiene,

---

[24] Members of the Disability Subclass have diagnoses including but not limited to the following: (a) lung disease, including asthma, chronic obstructive pulmonary disease (e.g. bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure and coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders and/or (i) developmental disability.  Compl. ¶ 78.

[and] medical care." *Furgess*, 933 F.3d at 290 (citing *United States v. Georgia*, 546 U.S. 151, 157, (2006)).   By virtue of their incarceration, members of the Disability Subclass qualify for the "services, programs, and activities" of ACJ at issue, which is the safe care ACJ has a duty to provide to those in its custody.

*Third*, conditions at ACJ deny the Disability Subclass that safety.   Allegheny County neglected its ADA obligations when it failed to provide the Disability Subclass with adequate means to protect themselves against COVID-19 and its serious complications.   For these reasons, the Disability Subclass is likely to succeed on the merits of its ADA claim, either given Allegheny County's denial of reasonable accommodations or under Title II's separate discrimination prong.

>    a.    **Allegheny County Must Provide Reasonable Accommodations to People With Disabilities at ACJ to Avoid Harm from COVID-19.**

After the release of approximately 600 people due to fear of coronavirus spread, Defendant consolidated the ACJ population, double-celling people, including those in the Disability Subclass, subjecting members of the Disability Class to an even higher chance of contracting COVID-19. Based on the imminent dangers that COVID-19 presents, particularly to those in the Disability Subclass, the reasonable accommodations Allegheny County must make are those mandated by the CDC, including single celling, provision of cleaning supplies, access to soap to facilitate handwashing, and staggered dining and recreation times in numbers that permit social distancing. As Allegheny County has wholly ignored its obligations under the ADA to provide members of the Disability Class with accommodations necessary for them to safely access programs and services at ACJ, it is liable for violating the ADA.   *Taylor*, 184 F.3d at 306; *see also Wareham v. Pennsylvania Dep't of Corr.*, No. 13-0188, 2014 WL 4231280, at *3 (W.D. Pa. Aug. 26, 2014) (finding that the DOC's "[f]ailure to afford Plaintiff with a reasonable accommodation . . . is sufficient to state a claim under Title II of the ADA").

> **b.** **Allegheny County is Discriminating Against People With Disabilities by Failing to Alter Practices at ACJ.**

Defendant Allegheny County also violates the ADA when it implements a policy or practice that is "facially neutral in [its] treatment of different groups but that in fact fall[s] more harshly on one group than another and cannot be justified by [a nondiscriminatory] necessity." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003); *see also Bowers v. Nat'l Collegiate Athletic Ass'n*, 118 F. Supp. 2d 494, 507–08 (D.N.J. 2000), *opinion amended on reargument*, 130 F. Supp. 2d 610 (D.N.J. 2001) ("A disparate impact claim is one that challenges a facially neutral policy because the burdens of that policy are borne disproportionately by a particular class of people.").

The second prong of Title II of the ADA "is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context." *Haberle*, 885 F.3d at 180 (quotations omitted) (listing cases). Importantly, the ADA's text shows Congress' intent to provide a mechanism to seek relief from discrimination without an "affirmative animus"; indeed, "the ADA evolved from an attempt to remedy the effects of 'benign neglect' resulting from the 'invisibility' of the disabled." *Helen L. v. DiDario*, 46 F.3d 325, 335 (3d Cir. 1995); s*ee also Presta v. Peninsula Corridor Joint Powers Bd.*, 16 F. Supp. 2d 1134, 1136 (N.D. Cal. 1998) (demonstrating "a recognition by Congress that discrimination against persons with disabilities differs from discrimination on the basis of, for example, gender, or race. . . . [A] person with a disability may be the victim of discrimination precisely because [he] did not receive disparate treatment when [he] needed accommodation."). The implementing regulations of the ADA "make clear" that discrimination "occurs when disabled persons, because of their disability, cannot derive a benefit from the state's services . . . even though [they] are given the exact same services or benefits as those afforded" to the non-disabled. *Belton v. Georgia*, No. 10-0583, 2012 WL 1080304, *9 (N.D. Ga. March 20, 2012) (citing 28 C.F.R. § 35.130(b)(1)(ii)-(iii)); *see also Taylor*, 184 F.3d at 306

("Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities.").

The Third Circuit has recognized that the ADA and its regulations "require that public entities take certain pro-active measures to avoid the discrimination proscribed by Title II." *Chisholm*, 275 F.3d at 324-25; *see also* 28 C.F.R. § 35.130(b)(7) ("[a] public entity *shall* make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability.") (emphasis added).   This is a mandate that Allegheny County has disregarded by failing to implement measures that would protect people with disabilities at ACJ from the extreme danger posed by COVID-19.   Although ACJ's current practices relating to cell assignment, meal allotments, and recreation time, among other things, are neutral on their face, they cause far more suffering and harm to people who are disabled and medically vulnerable to COVID-19 than to those who are not.   *See Sharpvisions, Inc. v. Borough of Plum*, 475 F. Supp. 2d 514, 525 (W.D. Pa. 2007) (finding that, in violation of the ADA, defendants' polices, impacting both disabled and non-disabled persons, would "have a greater adverse impact on persons with disabilities than on non-protected persons"); *McCoy v. Tex. Dep't Crim. Justice*, No. 05-370, 2006 WL 2331055, at *7 n.6 (S.D. Tex. Aug. 9, 2006) ("[F]ailure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than the non-disabled prisoner.").[25]   Without

---

[25] "To provide reasonable accommodation to prevent prisoners with disabilities from enduring more punishment than non-disabled prisoners is not special treatment.  For example, a bilateral amputee inmate claimed that because there were no handrails in the shower and toilet area, he repeatedly fell and hurt himself while trying to use the facilities.  To provide accommodations to remedy this problem only ensures that the disabled prisoner does not suffer psychologically or

meaningful changes to ACJ's current practices, members of the Disability Subclass are more likely to experience increasingly negative outcomes associated with COVID-19, including critical illness and likely death.   Consequently, as ACJ has not yet made any efforts to modify its policies to protect individuals with disabilities who are particularly vulnerable to COVID-19, the Disability Subclass has a high likelihood of success on the merits of their ADA claim.

> **3.     The Court Is Empowered to Grant Injunctive Relief to Abate Defendants' Unconstitutional and Unlawful Conduct.**
>
> > **a.     The Constitutional Violations Warrant Immediate Relief under § 2241 for Petitioners and Members of the Medically Vulnerable Subclass.**

This Court has the power to issue immediate writs of habeas corpus releasing Petitioners and the Medically Vulnerable Subclass on account of the constitutional violations discussed above. 28 U.S.C. § 2241 provides relief for incarcerated people who allege violations of the Constitution that make the fact of their confinement illegal.   28 U.S.C. § 2241(c)(3); *see also Preiser v. Rodriquez*, 411 U.S. 475, 494 (1973) (habeas corpus permits prisoners to attack "the fact or length of confinement" and seek "immediate or more speedy release"); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242–44 (3d Cir. 2005) (Becker, J.) (habeas corpus permits prisoners to attack "execution" of their sentence, which includes manner and method of detention); *Leamer v. Fauver*, 288 F.3d 532, 540 (3d Cir. 2002) (habeas corpus review available "where the deprivation of rights is such that it necessarily impacts the fact or length of detention").   Petitioners seek writs of habeas corpus as release is the only means to protect them from constitutionally deficient conditions that place them at a substantial risk of severe injury or death from COVID-19 while at ACJ.   ACJ's failure to enact basic mitigation policies—such as social distancing, personal hygiene,

---

physically more than non-disabled prisoners."   Emily Alexander, *The Americans With Disabilities Act and State Prisons:   A Question of Statutory Interpretation*, 66 Fordham L.Rev. 2233, 2283 (1998).

and proper medical testing and care—creates a risk to Petitioners and pretrial detainees who are in the Proposed Class that violates their constitutional rights. Due to their underlying medical conditions that make them especially susceptible to suffering critical illness and death from COVID-19, the Medically Vulnerable Subclass cannot be incarcerated at ACJ in a manner that comports with constitutional requirements. Accordingly, there is no safe alternative for the Medically Vulnerable Subclass other than release from the jail.

Petitioners thus seek immediate release for themselves and the Medically Vulnerable Subclass—not liability or damages as contemplated in a 42 U.S.C. § 1983 claim. *Leamer*, 288 F.3d at 540. Their claims thus fall "within the 'core of habeas' and require sooner release if resolved in [their] favor." *Leamer*, 288 F.3d at 544; *see also Robertson v. Allegheny Ct. of Com. Pleas*, No. 12-1080, 2012 WL 4712034, at *2 (W.D. Pa. Aug. 22, 2012) ("Section 2241 authorizes a federal court to issue a writ of habeas corpus to a pretrial detainee who 'is in custody in violation of the Constitution or laws or treaties of the United States.'" (quoting 28 U.S.C. § 2241(c)(3) and citing *Moore v. DeYoung*, 515 F.2d 437, 441–43 (3d Cir. 1975))); *Holland v. Rosen*, 277 F. Supp. 3d 707, 738 (D.N.J. 2017) (a "challenge to pretrial incarceration seeks a remedy available only in habeas" (quoting *Wallace v. Fegan*, 455 F. App'x 137, 140 (3d Cir. 2011))); *Dodd v. Derose*, No. 15-01088, 2015 WL 5029364, at *2 (M.D. Pa. Aug. 25, 2015) (same); *Harris v. Cty. of Atlantic*, No. 15-574, 2015 WL 715781, at *1 (D.N.J. Feb. 19, 2015) (same). Several courts have recently used § 2241 as the vehicle to order the immediate release of detainees facing the imminent threat of COVID-19. *See, e.g.*, *Avendano Hernandez v. Decker*, No. 20-1589, 2020 WL 1547459 (S.D.N.Y. Mar. 31, 2020); *Castillo v. Barr*, No. 20-00605, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020); *Coronel v. Thomas*, No. 20-2472, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020); *Basank v. Decker*, No. 20-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020).

**b.      The Constitutional Violations Warrant Injunctive Relief under § 1983 for all Proposed Class Members.**

This Court has the power to issue a preliminary injunction "necessary to correct" the ongoing constitutional violations at ACJ.  18 U.S.C. § 3626(a)(2); *see also, e.g.*, *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 778–79, 782–83 (M.D. Pa. 2016) (granting preliminary injunction enjoining plaintiff's continued solitary confinement); *Vazquez v. Carver*, 729 F. Supp. 1063, 1070–71 (E.D. Pa. 1989) (granting preliminary injunction reducing prison population).  Petitioners are entitled to a preliminary order from this Court directing that Defendants cure the constitutional infirmities of Petitioners' and the Proposed Class's conditions of confinement.  As discussed above, the conditions of confinement Petitioners and the Proposed Class are forced to endure at ACJ violate the Constitution and place Petitioners and the Proposed Class in grave and immediate danger.

Accordingly, Petitioners seek an order requiring Defendants to take immediate action to remedy this ongoing constitutional violation.  Specifically, Petitioners seek an order directing Defendants immediately institute policies at ACJ that are consistent with the CDC's public health guidelines, including:

- ACJ must provide all incarcerated persons a six-foot radius (133 ft$^2$) or more of distance between any other persons at all times, including during meals, transportation, court sessions, recreation, counts, and all other activities;

- ACJ must immediately re-open closed housing units and alter housing placements to maximize single-celling;

- ACJ must institute a safety plan to prevent a COVID-19 outbreak in the ACJ in accordance with CDC guidelines;

- ACJ must provide education to all incarcerated persons regarding the prevention methods, risks, and symptoms of COVID-19;

- ACJ must make readily available access to sanitation solutions, without charge, for the purposes of cleaning cell, dormitory, laundry, and eating areas, including sufficient antibacterial soap, and lift any ban on alcohol-based hygiene supplies, such as hand sanitizer and cleaning wipes;

- ACJ must provide adequate and appropriate COVID-19 testing for Petitioners and Proposed Class members, all other incarcerated persons, jail staff, and visitors;

- ACJ must waive all medical co-pays for those experiencing COVID-19-like symptoms; and

- ACJ must provide sufficient personal protective equipment, particularly masks, and adequate training on how to wear those materials to all staff and incarcerated persons at ACJ.[26]

Petitioners further request that this Court order Defendants to take all reasonable steps necessary to meet their obligations under the Constitution and the preliminary order, including but not limited to further decreasing the detained population at ACJ should it prove that Defendants cannot enact or comply with the policies listed above. These measures are urgently needed to remedy the unconstitutional conditions of confinement and will provide the requisite reasonable accommodations to which the members of the Disability Subclass are entitled under the ADA.

### c. The ADA Violations Warrant Immediate Relief for Petitioners and Members of the Disability Subclass.

This Court has the power to issue a preliminary injunction to address the need for immediate reasonable accommodations on behalf of the Disability Subclass, which includes Petitioners. *See, e.g.*, *Doe v. Nat'l Bd. of Med. Examiners*, 199 F.3d 146, 153 (3d Cir. 1999) (finding that, "because the injury complained of is an injury fairly traceable to [Defendant] that would be redressed by the relief [Plaintiff] seeks," Plaintiff had standing to seek a preliminary injunction under the ADA) (denying Plaintiff's preliminary injunction on other grounds); *Hornstine v. Twp. of Moorestown*, 263 F. Supp. 2d 887, 904 (D.N.J. 2003) (granting Plaintiff's motion for preliminary injunction under the ADA); *Derrick F. v. Red Lion Area Sch. Dist.*, No. 06-1463, 2006 WL 2547050, at *9 (M.D. Pa. Sept. 1, 2006) (granting, in part, Plaintiff's motion

---

[26] *See* Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020) *available at* https://bit.ly/2UKYGES; Amon Decl. ¶¶ 24-25.

for preliminary injunction under the ADA, among other claims).  As such, to the extent any of the above requested relief is denied, members of the Disability Subclass seek and are entitled to a preliminary order from this Court, directing Defendants to halt their current discrimination and accommodate the disabilities of the Disability Subclass by putting reasonable modifications, including those consistent with the CDC's public health guidelines, described above, in place.  *See supra* pp. 10–18.

###    B.    The Heightened Risk Of Infection From A Potentially Lethal Virus With No Vaccine Or Cure Is Irreparable Harm.

Denying preliminary relief will cause irreparable harm.  Petitioners and the entire Proposed Class (including the Medically Vulnerable and Disability Subclasses) will face the immediate, serious, and apparent risk of severe illness and possible death unless the Court intervenes.  *See, e.g.*, *Basank v. Decker*, No. 20-2518, 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020) (recognizing "the threat that COVID-19 poses to individuals held in jails and other facilities" and citing cases recognizing the same); *U.S. v. Stephens*, No. 15-95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (explaining prison inmates face "a heightened risk of contracting COVID-19 should an outbreak develop").[27]  This is not a speculative harm.  Cases of COVID-19 are growing exponentially.  As of the time of this filing, 432,596 cases have been reported in the United States.[28]  This historic virus has touched every corner of our Nation.  Allegheny County

---

[27] *See also* Letter from Mike McGrath, Chief Justice, Montana Supreme Court, to Montana Courts of Limited Jurisdiction Judges (Mar. 20, 2020), *available at* https://bit.ly/3dTmOwt ("Because of the high risk of transmittal of COVID-19, not only to prisoners within correctional facilities but staff and defense attorneys as well, we ask that you review your jail rosters and release, without bond, as many prisoners as you are able, especially those being held for nonviolent offenses. . . . Due to the confines of [correctional] facilities, it will be virtually impossible to contain the spread of the virus.").

[28] *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, Coronavirus Resource Center, Johns Hopkins University & Medicine, (last updated Apr. 9, 2020, 12:00:59pm) https://bit.ly/2JHm53w (last visited Apr. 9, 2020).

alone has reported 759 of Pennsylvania's 18,228 cases, and 12 of the Commonwealth's 338 deaths.[29]  This disease knows no boundaries.  It has infected people in nursing and elder-care homes,[30] on cruise ships,[31] rich and poor and old and young in major metropolitan areas[32] and middle-America small towns,[33] and prisoners and officers in correctional and detention facilities throughout the County.[34]  Almost every State has taken drastic steps to fight the spread of the virus, ordering at least 316 million Americans to remain in their homes.[35]  ACJ's walls will not keep the virus out—and they most certainly will not contain the virus from spreading throughout Allegheny County.

Given the serious and often lethal nature of this disease, and the overwhelming strain it has caused on our healthcare system, Petitioners and the Proposed Class have established a serious risk that without their requested relief they will be infected by coronavirus and develop COVID-19.  *See supra* at pp. 16–18.  Members of the Medically Vulnerable Class will most likely die if not released.  *See supra* at pp. 5–7.  Time is of the essence.  Even those Petitioners and Proposed Class members who get infected and survive still face the prospect of a prolonged and painful recovery, including the need for extensive rehabilitation for profound reconditioning, loss of digits,

---

[29] Pa. Dep't of Health, *COVID-19 Cases in Pennsylvania* (last updated Apr. 9, 2020 12:00pm), https://bit.ly/2UKL0d2 (last visited Apr. 9, 2020).

[30] *See, e.g.*, Sarah Boden, *Allegheny County Nursing Home Residents Test Positive for COVID-19*, 90.5WESA.fm (Mar. 27, 2020), https://bit.ly/2UHC9IU.

[31] *See, e.g.*, Mick Stinelli, *Pittsburgh Couple Under Quarantine After Leaving Cruise Ship at Center of COVID-19 Outbreak*, Pittsburgh Post Gazette (Mar. 5, 2020), https://bit.ly/3bMhp8C.

[32] *See, e.g.*, Chris Hoffman, *Coronavirus in Pittsburgh:  Officials Brace for Increased Spread of COVID-19*, KDKA2CBSPittsburgh (Mar. 22, 2020), https://cbsloc.al/2wfA79z.

[33] *See, e.g.*, Wallace McKelvey, *COVID-19 Will Accelerate EMS Crisis in Pa.'s Small Towns and Rural Areas, Experts Say*, Pittsburgh Post Gazette (Apr. 4, 2020), https://bit.ly/2xPGZLg.

[34] *See, e.g.*, Ryan Deto, *An Employee at the Allegheny County Jail Has Tested Positive for COVID-19*, Pittsburgh City Paper (Mar. 27, 2020), https://bit.ly/2V1HhGV.

[35] *See* Sarah Mervosh et al., *See Which States and Cities Have Told Residents to Stay at Home*, NYTimes.com (last updated Apr. 7, 2020), https://nyti.ms/2weeDtG.

neurological damage, and the loss of respiratory capacity.  Compl. ¶ 20; *see also supra* at pp. 5–7.

The risks here are all the more extreme, given that ACJ does not provide conditions of basic health

and safety sufficient to protect Petitioners, the Proposed Class as a whole, or members of the

Medically Vulnerable Subclass, who face the most significant risk of all.  Compl. ¶¶ 35-74; *see*

*also supra* at § I.  *See also Padilla v. Immigration & Customs Enf't*, No. 19-35565, 2020 WL

1482393, at *9 (9th Cir. Mar. 27, 2020) (affirming grant of preliminary injunction, agreeing

"Petitioners would suffer irreparable harm in the form of substandard physical conditions" and

"low standards of medical care," among other things); *Thakker*, 2020 WL 1671563, at *3–4

(finding petitioners' claim "rooted in imminent, irreparable harm," given they "face the inexorable

progression of a global pandemic creeping across the nation—a pandemic to which they are

particularly vulnerable due to age and underlying medical conditions").

        That Petitioners and members of the Proposed Class have not yet been infected makes no

difference.  *See, e.g.*, *Helling*, 509 U.S. at 33 (explaining prisoner "could successfully complain

about demonstrably unsafe drinking water without waiting for an attack of dysentery").  Courts

have not hesitated to find that the life-and-death stakes implicated by the possibility of contracting

COVID-19 while in detention establishes irreparable injury.  Just last week, the U.S. District Court

for the District of Maryland recognized that "once COVID-19 is introduced into a detention

facility, it spreads like wildfire," creating "a high likelihood of irreparable health consequences"

for detainees "that could not be alleviated without release."  Mem. Op. at 30, *Coreas v. Bounds*,

No. 20-0780, Dkt. No. 56 (D. Md. Apr. 3, 2020) (hereafter "*Coreas* Slip Op."), attached hereto as

Exhibit R.  The court explained that placing detainees with COVID-19 symptoms in isolation

"does not remove the risk that the virus will spread quickly once inside the facility," which creates

an increased "risk of death or serious illness" for "high-risk detainees," like those members of the Medically Vulnerable Subclass.  *Id.* at 6, 30.

This risk is even more apparent where detention facilities have not adopted the mitigation efforts recommended by the CDC.  For instance, the U.S. District Court for the Western District of New York observed that where detention facilities do not "isolate higher risk individuals," test "all incoming detainees or the staff that comes and goes" for COVID-19, do not provide detainees with masks or other PPE, and allow detainees to "eat their meals in communal settings and share bathing facilities," the "imminent risk" to detainees' "health, safety, and lives" constitutes irreparable harm.  *Jones v. Wolf*, No. 20-361, 2020 WL 1643857, at *11, 13 (W.D.N.Y. Apr. 2, 2020).  Courts around the Nation agree.  *See, e.g.*, *Coronel v. Decker*, No. 20-2472, 2020 WL 1487274, at *3 (S.D.N.Y. Mar. 27, 2020) (the "imminent risk to [petitioners'] health, safety, and lives" of contracting COVID-19 while in detention constituted irreparable harm warranting a TRO); *Basank v. Decker*, No. 20-2518, 2020 WL 1481503 at *4–5 (S.D.N.Y. March 26, 2020) ("The risk that Petitioners will face a severe, and quite possibly fatal, infection if they remain in immigration detention constitutes irreparable harm warranting a TRO").

The Court in *Thakker v. Doll* recently concluded that "[a]t this point, it is not a matter of *if* COVID-19 will enter Pennsylvania prisons, but *when* it is finally detected therein," and explained "there is little that can be done to stop the spread of COVID-19 absent effective quarantines and social distancing procedures," like those recommended by the CDC.  2020 WL 1671563, at *3–4.  Recognizing the impossibility of providing such measures in a detention center, the *Thakker* court found preliminary relief warranted, *id.* at *8-9, based in no small part on the fact that the detained *Thakker*-petitioners "face a very real risk of serious, lasting illness or death," *id.* at *4.  For Petitioners and other Proposed Class members, and certainly the members of the Medically

37

Vulnerable Subclass, there can be "no injury more irreparable" than the imminent threat that they will contract COVID-19, become critically ill, and likely die if not immediately released. *Id.* Immediate action from this Court is necessary to protect Petitioners, the Proposed Class, and the members of the Medically Vulnerable Subclass.

      **C.**      **The Public Interest Is Best Served By Minimizing The Spread Of COVID-19 Through Social Distancing And Hygiene Practices, But Those Steps Are Impossible At ACJ.**

Generally, "[a]s a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Ramsey v. City of Pittsburgh, Pa.*, 764 F. Supp. 2d 728, 734–35 (W.D. Pa. 2011) (quoting *AT & T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n. 8 (3d Cir.1994)). As in this case, where Petitioners have demonstrated that Defendants have violated their and the Proposed Class's constitutional rights, injunctive relief is always in the public interest. *See Ramsey*, 764 F. Supp. 2d at 735 (explaining "it is always in the public interest to prevent the violation of a party's constitutional rights" (quoting *G&V Lounge, Inc. v. Mich. Liquor Control Com'n,* 23 F.3d 1071, 1079 (6th Cir. 1994))). That interest—faithful enforcement of the Constitution—alone justifies the requested injunctive relief.

And on the facts here, that independently sufficient interest is buttressed by the undeniable public interest in minimizing the already unprecedented spread of COVID-19 throughout the Nation, generally, and at ACJ, specifically. *See Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (recognizing that "public health" is a "significant public interest"); *Allegheny Cty. Sanitary Auth. v. U.S.E.P.A.*, 732 F.2d 1167, 1177 (3d Cir. 1984) (affirming grant of preliminary injunction because minimizing negative effects on "the public health" was "in the public interest").

*First*, COVID-19 is highly contagious.  With no vaccine or cure, each new infection breeds exponentially more infected persons.  *See supra* at p. 7.  Healthcare professionals have accordingly (and nearly unanimously) agreed that the most critical actions that can be taken are preventive measures such as self-isolating, maintaining a distance of six feet from other persons, and frequent disinfection.  *Id*.  These measures are entirely lacking at ACJ, as detailed above, thus warranting immediate action from this Court.  *See supra* at pp. 10–13.  But even with the best intentions, high-risk persons like members of the Medically Vulnerable Subclass cannot avoid the risk of infection.  The only viable mitigation tactic for those detainees is release.  *See supra* at pp. 16–18.

Contagion has reached ACJ.  *See supra* p. 12 n.12.  It is only a matter of time before the virus manifests throughout its detainee population.  And once it does, the virus will not be contained by ACJ's walls.  Well before the virus reaches peak infection rates, it will spread across ACJ staff members who have contact with communities outside of the ACJ—in fact, it already has.  *See* Compl. ¶ 44.  Cases of infected staff members will only increase while the contagion sweeps throughout the detainee population.  ACJ staff will then, perhaps unknowingly, spread infection among the surrounding communities.  The only certain way to significantly hinder the spread of the virus within ACJ—and then from ACJ to the greater Allegheny County community, and further on—is for this Court to immediately order that Defendants impose necessary mitigation efforts throughout the facility, and order the immediate release of its most at-risk detainees.  There are no other viable options to smoke out the virus before it reaches peak infection rates.

*Second*, there is a strong public interest in minimizing the spread and thus the impact of COVID-19 on the local, Commonwealth, and national health care system.  Recent data shows that in the most likely infection scenarios, Pittsburgh-area hospitals will face a critical bed shortage in

a matter of weeks.[36]  A large-scale infection at ACJ will cause spillover into supporting hospitals, not to mention increase the number of sick individuals in the community needing prompt and critical medical care.  *See supra* at pp. 8–10.  The public interest is best served by taking all necessary steps to reduce infection, slow the spread of the virus, and provide all necessary and available support to prevent the collapse of the Allegheny County hospital network.

*Finally*, it cannot be overstated that the public interest is served by protecting those at elevated risk and with particular medical vulnerabilities from the ruthless nature of the virus.  On the whole, populations like those detained at ACJ face heighted risk of exposure and infection because of overcrowding and other problems existing at every detention facility across the Country.  *See supra* at pp. 8–10.  These risks are even higher for the Medically-Vulnerable Subclass.  *See supra* at pp. 5–7, 16–18.  And the risk is not limited only to detainees, given the close proximity with which ACJ staff members interact with ACJ population.  *See supra* at p. 9.  The release of individuals most vulnerable to COVID-19 thus reduces the overall health risk for ACJ detainees and staff alike.  *See supra* at pp. 16–18.  By decreasing the number of detainees, ACJ can institute greater and safer social distancing practices and prevent the need for increased numbers of staff on a given shift.  Immediate release of the Medically Vulnerable Subclass thus not only imposes minimal harm to the government, it also furthers the public interest in maintaining a healthy and orderly environment throughout this crisis.

Unsurprisingly, courts acknowledge the weighty public interest when granting injunctive relief where detainees face similarly grave threats to their health.  At bottom, "[t]he public has a critical interest in preventing the further spread of the coronavirus."  *Castillo v. Barr*, No. 20-

---

[36] Eric Heyl, *Coronavirus: Pittsburgh Hospitals Expected to Have Bed Shortages*, Patch.com (Mar. 18, 2020), *available at* https://bit.ly/2UY2JfU.

00605, 2020 WL 1502864, at *6 (C.D. Cal. Mar. 27, 2020); *see also Thakker*, 2020 WL 1671563, at *9 (finding "[e]fforts to stop the spread of COVID-19 and promote public health are clearly in the public's best interest").   An outbreak at ACJ, like the detention center in *Castillo*, would "endanger all of us—[the facility] detainees, [the facility] employees, residents [of the surrounding community], residents of the State . . . , and our nation as a whole," *Castillo*, 2020 WL 1502864, at *6; and would "quickly overwhelm the already strained health infrastructure within the facility," given the drastic health staff vacancies, "which would then place strain on the surrounding community hospitals," *Coronel*, 2020 WL 1487274, at *7.   Decreasing the ACJ's population— particularly by ordering immediate release of the Medically Vulnerable Subclass—would mean that "the tinderbox scenario of a large cohort of people getting sick all at once is less likely to occur, and the peak volume of patients hitting the community hospital would level out." *Id.*; *see also Basank*, 2020 WL 1481503 at *6 (explaining that in light of COVID-19 pandemic, "public health and safety are served best by rapidly decreasing the number of individuals detained in confined, unsafe spaces").[37]   This Court should follow suit and take immediate action to minimize the spread of COVID-19 throughout ACJ and the Allegheny County community.

### D.       The Balance Of Equities Favors Granting Relief To The Proposed Class.

Finally, the balance of equities weighs heavily in favor of granting the requested injunctive relief.   This preliminary injunction will not "substantially injure other interested parties." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018) (preliminary injunction warranted

---

[37] *See also* Chief Justice Bernette J. Johnson, *Letter to Louisiana District Judges* (Apr. 2, 2020), *available at* https://bit.ly/2V0OVkJ (directing that district court judges across the state take steps to minimize the populations of parish jails, explaining "[t]he decisions that you make will have a significant impact on our communities and our states and will save lives").

where relief "will not result in even greater harm to the nonmoving party").  Rather, given the nature of the circumstances here and the COVID-19 pandemic in general, ***not*** issuing preliminary relief would cause significant injury to the parties and the public at large.  Beyond the fact that "[t]he balance of the equities tips sharply" in favor of Petitioners and the Proposed Class, especially given that they face "irreparable harm to their constitutional rights and health," *Castillo*, 2020 WL 1502864, at *6; *see also Am. Freedom Def. Initiative v. Se. Pa. Transp. Auth.*, 92 F. Supp. 3d 314, (E.D. Pa. 2015) (same (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994))), the public interest clearly favors granting preliminary relief, *see supra* at pp. 39–42.  By contrast, Defendants' countervailing interest in indefinitely detaining Petitioners and the Proposed Class in obviously dangerous conditions is weak, at best.

Petitioners and the Proposed Class seek two remedies.  First, on behalf of all class members, Petitioners ask the Court to order ACJ to put in place policies that allow the class members to comply with current CDC guidance on social distancing, hygiene, sanitation and medical care.  Other than the administrative burden of enacting policies to mitigate the spread of COVID-19 throughout ACJ—which, frankly, Defendants should already be doing—there is no other "harm" (if one could call it that) to Defendants should this Court issue the requested (and deserved) preliminary relief.

Second, Petitioners and the Medically Vulnerable Subclass ask the Court to order their immediate release from ACJ custody.  The risks to this Subclass are even greater than to the general population at ACJ.  County Officials have already shown a willingness to release other detainees in an effort to stem the spread of coronavirus.  There is no compelling or even rational reason to deny the same treatment to these detainees, who are at the highest risk of COVID-19.

Any burdens on Defendants are far outweighed by what is at stake for Petitioners, the Proposed Class, and the public-at-large should preliminary relief be denied.  People are dying. This Court should do its part to help prevent Petitioners and the Proposed Class from becoming another statistic in this horrific chapter of our Nation's history.

## CONCLUSION

For the foregoing reasons, this Court should grant Petitioners' Motion for Preliminary Injunction, order that Defendants immediately enact policies instituting mitigation efforts at ACJ to prevent the spread of COVID-19, and issue writs of habeas corpus for the members of the Medically Vulnerable Subclass.

Dated: April 9, 2020

Respectfully Submitted,

*/s/ Alexandra Morgan-Kurtz*
Alexandra Morgan-Kurtz, Esq.
PA ID No. 312631
**PENNSYLVANIA INSTITUTIONAL LAW PROJECT**
100 Fifth Ave, Ste. 900
Pittsburgh, Pa 15222
T: (412) 434-6175
amorgan-kurtz@pailp.org

*/s/ David C. Fathi*
David C. Fathi**
dfathi@aclu.org
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION,
NATIONAL PRISON PROJECT**
915 15th Street N.W. 7th Floor
Washington, DC 20005
(202) 548-6603

*/s/ Bret D. Grote*
Bret D. Grote, Esq.
PA ID No. 317273
Quinn Cozzens, Esq.
PA ID No. 323353
Jaclyn Kurin, Esq.*
D.C. Bar ID No. 1600719
Jules Lobel, Esq.*
N.Y. Bar No. 1262732
Swain Uber, Esq.
PA I.D. No. 323477
**ABOLITIONIST LAW CENTER**
P.O. Box 8654
Pittsburgh, PA 15221
T: (412) 654-9070

*/s/ Sozi Pedro Tulante*
Sozi Pedro Tulante, Esq.*
PA ID No. 202579
Will W. Sachse, Esq.*
PA ID No.: 84097
Cory A. Ward, Esq.*
PA ID No. 320502
Ryan M. Moore, Esq.*
PA ID No. 314821
Rachel M. Rosenberg, Esq.*
PA ID No. 322960
**DECHERT LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808

bretgrote@abolitionistlawcenter.org
qcozzens@alcenter.org
jkurin@alcenter.org
jll4@pitt.edu
swain.uber@gmail.com

T: (215) 994-2496
F: (215) 665-2496
Sozi.tulante@dechert.com
will.sachse@dechert.com
ryan.moore@dechert.com
cory.ward@dechert.com
rachel.rosenberg@dechert.com

*/s/ Sara J. Rose*
Sara J. Rose, Esq.
PA ID No.: 204936
Witold J. Walczak, Esq.
PA ID No.: 62976
**AMERICAN CIVIL LIBERTIES UNION**
OF PENNSYLVANIA
PO Box 23058
Pittsburgh, PA 15222
T: (412) 681-7864 (tel.)
F: (412) 681-8707
srose@aclupa.org
vwalczak@aclupa.org

**Attorneys for Petitioners/Plaintiffs**

*pro hac vice pending*
**practice limited to federal courts*

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of April, 2020, a copy of the foregoing was served via

ECF upon all counsel of record:

Andrew F. Szefi
aszefi@alleghenycounty.us

John A. Bacharach
john.bacharach@alleghenycounty.us

Dennis R. Biondo, Jr.
dennis.biondojr@alleghenycounty.us


*/s/ Bret Grote*
Bret Grote