DIN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL GRAHAM; ALEXUS DIGGS; and HEATHER CONNOLLY, *on behalf of themselves and all others similarly situated*, <br><br> *Plaintiffs-Petitioners*, <br><br> v. <br><br> ALLEGHENY COUNTY; and ORLANDO HARPER, *Warden of Allegheny County Jail*, <br><br> *Defendants-Respondents*. | Civil Action No. 2:20-cv-00496-CRE <br><br> **ELECTRONICALLY FILED** |

**PLAINTIFFS' BRIEF IN SUPPORT OF
MOTION TO MODIFY MAY 27, 2020 CONSENT ORDER**

Petitioners/Plaintiffs seek to modify the May 27, 2020 Consent Order entered by this Court to require Defendants to implement mitigation efforts to prevent the introduction and transmission of the coronavirus by asymptomatic incarcerated individuals and jail staff to medically vulnerable, unvaccinated class members confined at the Allegheny County Jail ("ACJ") for the coronavirus.[1] Specifically, Plaintiffs seek (1) testing of incarcerated individuals when they are initially admitted to the ACJ; and (2) testing of all incarcerated individuals a second time while they are in intake housing, before they are transferred to general population; and[2] (3) reassignment of unvaccinated ACJ staff to work shifts or positions where they will have no direct contact with unvaccinated incarcerated individuals.[3]

---

[1] The term "coronavirus" as used in this brief refers to SARS-CoV-2 and "COVID-19" will refer to the disease caused by the virus.
[2] The term "admittee(s)" refers to newly incarcerated individuals who are held in the ACJ Intake Department or reside on an intake housing pod.
[3] Pursuant to the Allegheny County Prison Employees Independent Union Contract, the Warden of the Allegheny County Jail has the power to reassign correctional officers to another position

The Consent Order provides that a party can move to modify ACJ's COVID-19 policies "to reflect updated guidance from the CDC . . . and respond to new facts or conditions."[4] That is precisely why the ACJ's COVID-19 policies need to be updated – to account for worsening conditions and new guidance.[5] In February 2021, nearly 146 people incarcerated at ACJ tested positive for COVID-19.[6] Within a month, the positivity rate for incarcerated individuals surged from 3% to 33%.[7] Equally alarming, since December 2020, the ACJ staff positivity rate has been above 50%, and nearly twice the rate in Allegheny County.[8] There's also more contagious and possibly deadlier variants of the coronavirus[9] spreading in Allegheny County,[10] which can

---

for a "good and sufficient reason" such as preventing the spread of a communicable disease to medically vulnerable incarcerated individuals.

[4] *See* Consent Order 1, ECF Doc. No. 71.

[5] *See* Exhibit A, Declaration of William Weber ¶¶ 11-12 ("Weber Decl.") (Dr. Weber is a Clinical Associate of Emergency Medicine at the University of Chicago. He obtained a Master's Degree in Public Health at Northwestern University, where he focused on public safety and the epidemiology of disease. Dr. Weber has worked on the national level to guide care within the pandemic of the novel SARS-CoV-2 virus (COVID-19) including co-authoring a paper on criteria for initiating cardiopulmonary resuscitation (CPR) on critically-ill patients with COVID-19, co-authoring a book chapter in the ACEP national COVID-19 manual, and co-authoring content for a World Health Organization (WHO) course on COVID-19 management and infection control strategies.).

[6] *Id.* ¶ 10.

[7] *Id.*

[8] *Id.*

[9] Weber Decl. ¶ 13; *About Variants of the Virus that Causes COVID-19*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Feb. 12, 2012), https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html; Kelsey Vlamis, *UK Scientists Estimate Coronavirus Variant Could Be Far More Lethal Than Original Strain*, BUS. INSIDER (Feb 14, 2021; 12:36 AM), https://www.businessinsider.com/uk-coronavirus-variant-likely-deadlier-than-original-strain-2021-2 (Scientists with the British government estimate that the U.K. COVID-19 variant "could be 30% to 70% deadlier than the original virus."); James Gallagher, *Coronavirus: UK Variant 'May be More Deadly'*, BBC (Jan. 22, 2021), https://www.bbc.com/news/health-55768627 (Scientists with the British government estimate that the U.K. COVID-19 variant is around 30% deadlier than the original virus.).

[10] Weber Decl. ¶ 13; Haillie Lauer, *COVID-19 Update: U.K. Variant Found in Allegheny County*, Pittsburgh-Post Gazette (Feb. 10, 2021; 4:52 PM), https://www.post-gazette.com/news/health/2021/02/10/covid-19-coronavirus-pittsburgh-allegheny-county-pennsylvania-cases-deaths-data-pandemic-health-vaccine/stories/202102100114?cid=search.

devastate correctional facilities.[11] In light of the threat that the virus presents to people in congregated settings like jails, the Centers for Disease Control and Prevention ("CDC") has issued updated guidance recommending the routine testing of admittees in correctional facilities in communities with high rates of transmission, such as Allegheny County.[12]  Remarkably, Defendants have rejected this informed guidance and rebuffed requests that they preventatively test admittees at ACJ. What is more, Defendants have taken no steps to prevent the approximately 25% of ACJ employees who have refused to be vaccinated from having direct contact with unvaccinated incarcerated individuals.[13] Instead, Defendants continue to fall back to their practice of taking employees' and incarcerated individuals' temperatures, which fails to detect the 40% of the COVID-19 carriers who are asymptomatic.[14]

In accordance with this Court's rules, the parties met and conferred on January 26, 2021 and March 3, 2021,[15] in an attempt to resolve these matters but were unable to resolve their differences. Therefore, Petitioners/Plaintiffs now file this motion seeking to amend the Consent Order to reflect the most recent scientific guidance from the CDC and public health experts to prevent the further spread of the coronavirus, by requiring preventative testing of admittees at

---

[11] Weber Decl. ¶ 13; *see, e.g.*, Angie Jackson, *Michigan Prison System's Coronavirus Variant Cases More Than Triple*, DETROIT FREE PRESS (Feb. 27, 2021; 6:02 A.M.), https://www.freep.com/story/news/local/michigan/2021/02/27/uk-covid-variant-michigan-prison/6833376002/.
[12] Weber Decl. ¶ 12.
[13] *Id*. ¶ 32-33; Nick Trombola, *Just Under Half of Eligible Allegheny County Jail Workers Received COVID Vaccine, Deputy Warden Says*, PITTSBURGH POST-GAZETTE (March 4, 2021; 7:39 P.M.), https://www.post-gazette.com/news/crime-courts/2021/03/04/Allegheny-County-Jail-COVID-19-vaccine-employees/stories/202103040178.
[14] Weber Decl. ¶ 12.
[15] In advance of the meet and confer, Plaintiffs' counsel sent a letter to Defendants' counsel explaining in detail Plaintiffs' requests to modify ACJ's COVID-19 Policy to implement preventative testing and reassigning unvaccinated ACJ employees, and the substantial risk faced by class members if Defendants fail to implement proposed policy modifications.

ACJ and assigning unvaccinated employees to work details where they would have no contact with unvaccinated incarcerated people.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A. The Consent Order

On May 27, 2020, the Court entered a Consent Order, whereby Defendants agreed to implement and comply with the ACJ Policy titled "Continuing of Operations Plan: COVID-19 (Updated)" May 21, 2020 ("the Policy"). The Policy was incorporated in the Consent Order and remains in "full force and effect."[16] The parties agreed that either party could modify "the Policy to reflect updated guidance from the CDC and Allegheny County Health Department ("ACHD") and respond to new facts or conditions."[17]  If "the parties disagree about the need for such revisions or changes to the Policy, the party seeking the change may petition the Court."[18] On February 22, 2021, the Court entered an order extending the duration of the Consent Order.[19]

### B. CDC and Leading Authorities Recommend Preventative Testing for the Coronavirus at Jails Like ACJ

The CDC and public health researchers now recommend ongoing, routine preventative testing to prevent the introduction of the coronavirus into correctional facilities and contain its spread.[20] ACJ's symptoms-based testing policy, which primarily consists of taking people's temperatures, is obsolete and places medically vulnerable class members at a substantial risk of harm from transmission by asymptomatic employees and incarcerated individuals.[21] The expert guidance for testing incarcerated people for the coronavirus has changed significantly in the nine

---

[16] *See* Consent Order at 1 ¶¶ 2-3, ECF Doc. No. 71.
[17] *Id.*
[18] *Id.*
[19] Order, ECF Doc. No. 102.
[20] Weber Decl. ¶ 12.
[21] *Id.* ¶¶ 14-15.

months since the Consent Order was first entered. At that time, due to scarcity of testing kits and limited research on the transmission of the virus, the CDC recommended that congregate facilities such as jails only test individuals when they exhibited symptoms of the coronavirus.

Now, scientists have documented that 40% of the people who contract the coronavirus are asymptomatic[22] and that, in addition to developing COVID-19, they can suffer from harmful, long-lasting medical problems including serious heart and lung complications.[23] These asymptomatic individuals contribute to the spread of the coronavirus in correctional facilities and the surrounding community.[24]

---

[22] Weber Decl. ¶ 12; *Summary of Guidance for Public Health Strategies to Address High Levels of Community Transmission of SARS-CoV-2 and Related Deaths*, December 2020, Centers for Disease Control and Prevention (Dec. 11, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6949e2.htm (finding "approximately 50% of transmission [comes] from asymptomatic persons").

[23] Weber Decl. ¶ 12; s*ee, e.g.*, Jennifer Couzin-Frankel, *From 'Brain Fog' to Heart Damage, COVID-19's Lingering Problems Alarm Scientists*, Science (July 31, 2020, 1:30PM), https://www.sciencemag.org/news/2020/07/brain-fog-heart-damage-covid-19-s-lingering-problems-alarm-scientists; Valentina O. Puntmann et al., *Outcomes of Cardiovascular Magnetic Resonance Imaging in Patients Recently Recovered from Coronavirus Disease* 2019 (COVID-19), 5 J. Am. Med. Cardiology 1265, 1267–70 (2020), https://jamanetwork.com/journals/jamacardiology/fullarticle/2768916; Carlos del Rio et al., *Long-term Health Consequences of COVID-19*, 324 J. Am. Med. 1723 (2020), https://jamanetwork.com/journals/jama/fullarticle/2771581; Lora Kolodny, *Long-haul Symptoms Should be a 'Wake-Up Call' for Young People When It Comes To Avoiding Covid, Texas Children's Doctor Says*, CNBC (Feb. 9, 2021; 9:10 P.M.), https://www.cnbc.com/2021/02/09/long-haul-covid-symptoms-should-be-a-wake-up-call-for-young-people-texas-childrens-doctor-says.html ("About 10 to 30% of all Covid patients will suffer from long-haul symptoms, according to the latest research from Mt. Sinai's Center for Post-Covid Care.").

[25] Weber Decl. ¶ 12; *see, e.g.*, *Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities*, Centers for Disease Control and Prevention (Dec. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html; *CDC Guidance for Expanded Screening Testing to Reduce Silent Spread of SARS-CoV-2*, Centers for Disease Control and Prevention (Dec. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/php/open-america/expanded-screening-testing.html.

Importantly, in December 2020, the CDC updated its guidance for correctional facilities, recommending preventative intake testing to deter asymptomatic spread of the virus.[25] The CDC now specifically recommends routine intake testing (1) when a positive case exists, or (2) when transmission rates are high in the surrounding community.[26] The CDC's updated guidance reflects existing recommendations from public health researchers.[27] ACJ clearly meets these criteria for testing admittees as evidenced by the surging cases at the jail[28] and consistently high positivity rate in Allegheny County.[29]

## II. Adherence to Updated CDC Recommendations Advances Public Health and Constitutes Good Cause to Modify the Consent Order

There is good cause to modify the Consent Order given the CDC's updated guidance and because ACJ's failure to test asymptomatic admittees and prevent unvaccinated employees from having contact with unvaccinated incarcerated individuals places the medically vulnerable class members at a serious risk of harm in violation of the Fourteenth Amendment.

To prevail on a conditions of confinement claim, a plaintiff must meet two requirements: (1) the deprivation alleged must objectively be "sufficiently serious," and (2) the "prison official

---

[25] Weber Decl. ¶ 12; *see, e.g.*, *Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities*, Centers for Disease Control and Prevention (Dec. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html; *CDC Guidance for Expanded Screening Testing to Reduce Silent Spread of SARS-CoV-2*, Centers for Disease Control and Prevention (Dec. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/php/open-america/expanded-screening-testing.html.

[26] Weber Decl. ¶ 12; *CDC Guidance for Expanded Screening Testing to Reduce Silent Spread of SARS-CoV-2*, Centers for Disease Control and Prevention (Dec. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/php/open-america/expanded-screening-testing.html

[27] Weber Decl. ¶ 12; *see, e.g.*, Crystal Watson et al., *COVID-19 and the US Criminal Justice System: Evidence for Public Health Measures to Reduce Risk* 2, Bloomberg School of Public Health, Johns Hopkins Univ. (Oct. 2020), https://www.centerforhealthsecurity.org/our-work/pubs_archive/pubs-pdfs/2020/20201015-covid-19-criminal-justice-system.pdf.

[28] Weber Decl. ¶ 11.

[29] *Id.*

must have a sufficiently culpable state of mind." *See Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). As pretrial detainees, plaintiffs need only show that deprivation is objectively unreasonable. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473-74 (2015) ("[A] pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose."). Several courts have applied the objective unreasonable standard when the conditions of confinement increase the risk of pre-trial detainees facing serious illness or death from contracting the coronavirus. *See e.g., Booth v. Banks*, 468 F.Supp.3d 101 (D.C. Cir. 2020); *Mays v. Dart*, 974 F.3d 810 (7th Cir. 2020).

### A. Class Members Are at Risk of Serious Injury or Death Absent Defendants Implementing Intake Testing and Limiting Their Exposure to Uninoculated Employees

Class members satisfy the first prong because they are at a substantial risk of being infected by asymptomatic individuals and suffering serious injury or death, as ACJ's current COVID-19 policy does not require preventative testing of admittees or separating unvaccinated employees from unvaccinated class members.[30] The United States Supreme Court has long recognized that the government violates the U.S. Constitution when it crowds people into cells with others who have "infectious maladies" or otherwise exposes them "to a serious, communicable disease." *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (citing *Hutto v. Finney*, 437 U.S. 678, 682 (1978)). This is true "even though the possible infection might not affect all of those exposed." *Id.*

---

[30] Consent Order 1, ECF Doc. No. 71 at 13-16.

Last month alone, nearly 146 incarcerated individuals tested positive at ACJ.[31] The positivity rate skyrocketed from the month before from 3% to 33%.[32] The more contagious and possibly 30% to 70% deadlier coronavirus variant has already been detected in Allegheny County and could be devastating if it reaches the jail[33]

ACJ's practice of asking screening questions[34] or taking admittees' temperatures, is outdated, underinclusive and far short of what is needed to safeguard the safety and health of both staff and incarcerated persons at the ACJ.[35] Moreover, ACJ's intake process for admittees, involving processing the individual in the Intake Department and then transferring him to intake housing for quarantine, falls short of CDC guidance or effectively deterring the introduction of the virus to the incarcerated or staff in general population.[36] Asymptomatic transmission is highly likely at ACJ because admittees are held the Intake Department in overcrowded holding cell for long durations.[37] Conditions while an admittee is quarantined in intake housing at ACJ can actually increase the risk of infection when admittees are placed with several different cellmates, even when he's nearing the end of the quarantine period[38] and individuals leave the

---

[31] Weber Decl. ¶¶ 10-11.
[32] *Id.*
[33] Weber Decl. ¶ 13.
[34] Weber Decl. ¶ 17 ("Inmates report that ACJ has not effectively informed them of symptoms associated with COVID-19 at intake, making it difficult for inmates to know if symptoms they experience could potentially indicate an infection.").
[35] *Id.* ¶¶ 17-18.
[36] Weber Decl. ¶ 17-18.
[37] Weber Decl. ¶ 17 ("Inmates admitted to the jail are held in crowded cells often with 10 people or more for extended periods, lasting hours and even days. These conditions do not effectively inmates to physically distance themselves or properly quarantine to prevent asymptomatic spread.").
[38] Weber Decl. ¶ 18 ("Inmates receive one or more different cellmates throughout the quarantining process, meaning when inmates are nearing the end of the quarantine period they could potentially be exposed to COVID-19, which they can then spread to the inmates when they transfer to a general population pod.").

pod daily, including correctional officers, healthcare staff, pod workers, and even newly admitted individuals who must leave their pods to attend their court hearings and arraignments.[39]

Correctional staff are vectors for transmitting the coronavirus from the facilities to the surrounding community and vice-versa.[40] ACJ is no exception as shown by the staff positivity rate. Since December 2020, the staff positivity rate has been over 50% and nearly double the County rate, which has hovered around 30%.[41] Moreover, several significant coronavirus outbreaks at ACJ occurred soon after an employee tested positive, underscoring the threat that infected staff pose to the health and safety of the people in the jail.[42] Despite this, Defendant Harper continues to abdicate his authority to reassign the approximately 172 employees who have refused to be vaccinated to positions that do not involve direct contact with the unvaccinated class members, thus placing them at a substantial risk of being infected.[43]

### B. Defendants' Refusal to Implement Preventative Testing & Limit Class Members' Contact with Unvaccinated Employees is Objective Unreasonable

i. Preventative Testing of Admittees is Necessary to Detect and Deter Virus Transmission into ACJ by Asymptomatic Carriers.

Failing to implement preventative intake testing is objectively unreasonable. The CDC and leading public health authorities have found that such testing is essential to preventing asymptomatic transmission in carceral facilities with positive cases and where there is substantial

---

[39] *Id.*
[40] Weber Decl. ¶ 9.
[41] Weber Decl. ¶ 11. The number of positive employees might have been even higher. *Id.* ("ACJ employees have complained that they must use up their sick leave while they are quarantined even when they are exposed to COVID-19 at the jail. The difficulty employees face in getting paid time off for COVID-19 infection leaves little incentive to either report symptoms or get tested. Many staff members likely still come to work at ACJ even though they know they have COVID-19 symptoms.").
[42] Weber Decl. ¶ 16.
[43] Weber Decl. ¶ 33.

transmission in the community.[44] Both these scenarios apply here as the rate of positive cases of incarcerated people and staff have surged at ACJ and Allegheny County has one of the highest rates of transmission of all Pennsylvanian counties.

Intake testing has become a standard practice for many correctional facilities. The preventative, routine intake testing has been shown, that when used in conjunction with other virus mitigation efforts, to detect asymptomatic admittees, reduce positive cases, and even prevent hospitalizations and deaths due to the coronavirus.[45] Prisons in "Pennsylvania and Illinois require incoming inmates transferring from county jails to be quarantined for 14 days and test negative 72 hours prior to arriving at the prison. Inmates are immediately quarantined for a 14-day period and then tested again before being transferred to another housing unit."[46] The Cook County Jail and the Philadelphia Department of Prisons have implemented similar intake testing policies. Researchers found that Cook County Jail's virus mitigation efforts, which included asymptomatic testing, likely saved 30 lives and prevented 400 hospitalizations.[47]

Ongoing routine testing is needed while incarcerated people are held in intake processing and intake housing to prevent the significant risk of more cases of the coronavirus being reintroduced into the jail. When an incarcerated person is admitted to ACJ, they must complete an intake process before being transferred to an intake housing pod. Testing at initial intake would protect other incarcerated people and staff while individuals are housed for weeks in intake. While a second test while in the intake housing pod prior to transfer to the general population would ensure that all individuals who may have been too early in the incubation

---

[44] Weber Decl. ¶ 12.
[45] Weber Decl. ¶ 12.
[46] Weber Decl. ¶ 22.
[47] *Id.*

period to test positive initially are identified before they can spread the coronavirus to the general population.[48] Each of these steps is recommend by the CDC and is necessary to protect the medically vulnerable class, all individuals incarcerated at ACJ, staff and the community from the greatest public health threat in decades.[49]

Defendants are undeniably aware of the serious risk that the coronavirus poses to Plaintiffs from asymptomatic carriers and are aware that ACJ's symptoms-based testing policy cannot adequately detect 40% of the population that is infected but asymptomatic.[50] Moreover, there are not practical considerations that would discourage preventative testing of admittees. Intake testing would not pose any unduly burdensome challenges for ACJ because tests results are often render quickly, about 2 days from the date of collection, and testing would not unnecessarily prolong confinement of admittees because testing would be integrated into the jail's existing quarantine process, which all admittees must complete.[51] Testing supplies are also available. Defendant Williams has confirmed on several occasions that ACJ would obtain the testing kits needed to routinely test asymptomatic carriers if ordered to.[52]

Additionally, ACHD confirmed that "there are no rules preventing" additional testing at the jail.[53] In fact, on January 27, 2021, at the Allegheny County Covid-19 Briefing, the Director

---

[48] Weber Decl. ¶¶ 23-28, 36.
[49] Weber Decl. ¶ 36.
[50] In January 2021, Plaintiff sent Defendants a detailed letter about the risk of asymptomatic carriers in correctional facilities, the CDC's guidance and other public health authorities supporting the use of preventative asymptomatic testing.
[51] Weber Decl. ¶¶ 23-28.
[52] *See* JOB Meeting Minutes, May 2020. at 12, 17-22, available at https://alleghenycontroller.com/the-controller/jail-oversight-board/ (Deputy Chief Williams has stated. "I'm certain we would be able to get any testing equipment that was needed.").
[53] *Id.* at 44. Dr. Brink's reservations against mass testing were primarily based on the CDC guidance at that time, which did not recommend asymptomatic testing. Objections by JOB members and by County Council to mass testing occurred in the Summer of 2020, before the

of the Allegheny Health Department, Dr. Debra Bogen commented that there needs to be more coronavirus testing in the community, and she advocated for the use and accuracy of rapid antibody tests.[54] The rationale for the increase in testing must extend to ACJ, especially given that incarcerated individuals are at a substantially greater risk of contracting the virus, lack the ability to exercise self-care, obtain medical care or PPE, in comparison to people in the community.

> ii. There is a Substantial Likelihood That Unvaccinated ACJ Employees Will Infect Medically Vulnerable Class Members Unless Reassigned.

Defendants' failure to reassign unvaccinated employees to a position where they won't have direct contact with unvaccinated incarcerated individuals is objectively unreasonable as Defendant Harper has already recognized the danger of asymptomatic employees infecting individuals at the jail and because the Warden has the authority to reassign these employees.

There are 683 employees at ACJ "who have direct care with the inmate population to varying degrees."[55] As of March 4, 2021, 172 employees have refused to be vaccinated. Even though Defendant Harper has acknowledged that he has the authority to reassign employees to a different position unless it's for an arbitrary reason,[56] and has been informed about the risks to class members by failing to do so,[57] Defendant Harper has decided that the unvaccinated employees will continue to have direct contact with incarcerated individuals because entertaining proposals to reassign unvaccinated officers would require "a whole lot [of work] involved."[58]

---

scientific community, including CDC learned the devastating and expansive threats of asymptomatic spread in correctional facilities.
[54] https://youtu.be/-KETMFGmhNo
[55] Exhibit J, Excerpts of Jail Oversight Board Meetings.
[56] Id.
[57] On March 3, 2021, Plaintiffs sent Defendants a letter explaining in detail the risk that unvaccinated ACJ employees pose to unvaccinated medically vulnerable class members, that Defendant Harper had the power to reassign these employees, and requested that he implement that change.
[58] Id.

Defendants can require ACJ employees to be vaccinated if they want a work shift that involves contact with incarcerated individuals. *See Jacobson v. Massachusetts* 197 U.S. 11 (1905) (finding that the state could exercise its police power to require denizens to get vaccinated for a communicable disease unless they have medical reason).[59] ACJ employees who refuse to be inoculated on religious grounds, because of a disability, or for another reason can work remotely or be assigned to the many other positions that have little to no contact with incarcerated people.

Plaintiffs' requested relief does not violate the ACJ correctional officers' collective bargaining agreement (CBA) with the County. The CBA grants Defendant Warden the right to reassign an employee's work shift or position based on a "good and sufficient reason", which would include stopping a deadly pandemic and protecting unvaccinated, medically vulnerable inmates. Allegheny County Prison Employees Independent Union Contract (Warden may remove an employee from an awarded job bid based on "good and sufficient reason thereof."). The County may also reassign unvaccinated employees pursuant to its managerial rights and operational needs. *Allegheny County v. Allegheny County Prison Employees Independent Union*, PER-A-19-123-W, 7 (2020) ("[T]he County [has a] managerial right to assign an employee on

---

[59] *See also U.S. Equal Emp. Opportunity Comm'n, What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (Dec. 16, 2021) https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws?mkt_tok=eyJpIjoiWW1VMk4yUTBOakV4TmpRMyIsInQiOiJEemxoTmhtUmNDaGI5Vj VcL3dXTXA2VmF1TjZhZEJUYUNteGRkWUVYc2JGZUtUYjFBaHBaOG82c1orVUVwSnI4 ejFINFN3ckt3QzcwRjdUS1hzVnRwbVF4SXBmTW0wcWVXOWZ0ZU1lQ2Q3YVVFbytKeE ExdjdvN0RlVHVWbXpKTkQifQ%3D%3D (The Equal Employment Opportunity Commission issued guidance stating that employers can require staff to be vaccinated for the coronavirus, so long as the mandate comports with federal law).

13

light duty to a particular shift and/or pass day, while on light duty, based on the County's operational needs.").

Defendant Harper has recognized that there likely are many asymptomatic employees given the high rate of transmission in the community, and thus he found it necessary to close the onsite employee gym to prevent the spread of the virus.[60] If asymptomatic, unvaccinated employees present a risk of spreading the coronavirus in one room at the jail, they present the same or even greater risk when they are standing inches apart from unvaccinated individual while the employee checks their cell window; distributes or collects meal trays, supplies, or trash; or the many other direct encounters between them.

Ultimately, good cause exists to modify the Consent Order because Defendants' failure to test admittees and reassign unvaccinated employees is objectively unreasonable and places the lives of class members, staff and the community at risk.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter an order directing Defendant Allegheny County to: (1) test incarcerated individuals when they are initially admitted to the jail; (2) test all incarcerated individuals a second time while they are residing in intake housing, before being transferred to general population; and (3) assign unvaccinated employees to position with no contact with unvaccinated incarcerated individuals.

Respectfully submitted,

| | |
|---|---|
| */s/ Sara J. Rose* | */s/ Bret Grote* |
| Sara J. Rose, Esq. | Bret D. Grote, Esq. |
| PA ID No.: 204936 | PA ID No. 317273 |
| */s/ Witold J. Walczak* | */s/ Jaclyn Kurin* |
| Witold J. Walczak, Esq. | Jaclyn Kurin, Esq. |
| PA ID No.: 62976 | D.C. Bar ID No. 1600719 |
| **American Civil Liberties Union of** | */s/ Swain Uber* |

---

[60] Exhibit J, Excerpts of Jail Oversight Board Meetings.

**Pennsylvania**
PO Box 23058
Pittsburgh, PA 15222
T: (412) 681-7864 (tel.)
F: (412) 681-8707
srose@aclupa.org
vwalczak@aclupa.org

/s/ *Alexandra Morgan-Kurtz*
Alexandra Morgan-Kurtz, Esq.
PA ID No. 312631
**PA Institutional Law Project**
100 Fifth Ave, Ste. 900
Pittsburgh, Pa 15222
T: (412) 434-6175
amorgan-kurtz@pailp.org

/s/ *Sozi Pedro Tulante*
Sozi Pedro Tulante, Esq.
PA ID No. 202579
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
T: (215) 994-2496
F: (215) 665-2496
Sozi.tulante@dechert.com
*Admitted pro hac vice*

*Attorneys for Petitioners/Plaintiffs*

Swain Uber, Esq.
Of Counsel
PA I.D. No. 323477
**Abolitionist Law Center**
P.O. Box 8654
Pittsburgh, PA 15221
T: (412) 654-9070
bretgrote@abolitionistlawcenter.org
qcozzens@alcenter.org

DATE:      March 11, 2021